IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **ALABAMA PUBLIC SCHOOL AND COLLEGE AUTHORITY,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **CASE NO. 2:08-CV-863-WKW** |
| **JPMORGAN CHASE BANK,** | ) ) | |
| **Defendant.** | ) ) | |

**MEMORANDUM OF THE ALABAMA PUBLIC SCHOOL AND COLLEGE
AUTHORITY IN OPPOSITION TO JPMORGAN CHASE BANK'S
MOTION TO DISMISS**

1008932.29

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

ARGUMENT AND AUTHORITY .................................................................................... 14

   I. STANDARD ON MOTION TO DISMISS .................................................................. 14

   II. THE SWAPTION IS VOID ....................................................................................... 15

      A. The Absence of the Finding, Determination and Certification Required
         By Alabama Law Voids the Swaption ..................................................................... 15

         1.   The Statue Requires Certification .................................................................... 15

         2.   The Representations Upon Which JPMorgan Relies Do Not Satisfy,
              and Cannot be Substituted for, the Statutorily Required Certification ............... 16

         3.   Estoppel Cannot Be Invoked to Require the Authority to Exceed Its
              Statutory Authority .......................................................................................... 18

      B. Despite Its Label, the Contract Structured By JPMorgan Is Not a Lawful
         Swaption Under Alabama Law ............................................................................... 20

      C. The Swaption Does Not Satisfy the Aggregate Annual Obligation Test Under
         the 2001 Act .......................................................................................................... 21

   III. THE SWAPTION IS VOIDABLE ............................................................................. 24

      A. The Authority's Issuance of Refunding Bonds was a Precondition for, and an
         Integral Part of, the Swaption ................................................................................ 25

      B. The Authority's Inability to Issue Refunding Bonds Frustrates the Purpose
         of the Swaption ..................................................................................................... 29

         1. A Liquidity Facility is Unavailable to the Authority ........................................ 29

         2.   The Unforeseeable National Credit Crisis Has Contributed to Frustration
              of the Purpose of the Swaption ....................................................................... 30

CONCLUSION ................................................................................................................. 31

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE**

Alabama Power Co. v. City of Fort Payne, 187 So. 632, 635-640 (Ala. 1939) ......................... 16

Arons v. Charpentier, 36 A.D.3d 636, 637 (N.Y. App. Div. 2007) ........................................... 30

BankAtlantic v. Blythe Eastman Paine Webber, Inc.,
    955 F.2d 1467, 1469 (11th Cir. 1992) ...................................................................................... 3

Birmingham v. Lee, 48 So. 2d 47, 55 (Ala. 1950) ...................................................................... 17

Brown-Crummer Inv. Co. v. Florala, 55 F.2d 238, 242 (M.D. Ala. 1931) ................................ 19

Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999) ....................................... 13

Bush v. Protravel Intern., Inc., 746 N.Y.S.2d 790, 797 (N.Y. Civ.Ct. 2002) ............................. 31

County Board of Education v. Slaughter, 160 So. 758, 760 (Ala. 1935) ............................. 17, 18

Gamble v. PinnOak Res. LLC, 511 F. Supp. 2d 1111, 1125 (N.D. Ala. 2007) ......................... 14

Hicks v. Bush, 180 N.E.2d 425, 427, (N.Y. 1962) ................................................................ 26, 28

Hoosier Energy Rural Elec. Coop. Inc. v. John Hancock Life Ins.,
    No. 1:08-cv-1560-DFH-DML, (S.D. Ind. Nov. 25, 2008 *27) ............................................ 31

Imperial Group, Ltd. v. Lamar Corp., 347 So. 2d 988, 989 (Ala. 1977) .............................. 18, 19

Lindenbaum v. Royco Property Corp., 165 A.D.2d 254, 259 (N.Y. App. Div. 1991) ......... 25, 26

Perkins v. Shelby County, 985 So. 2d 952, 956 (Ala. 2007) ...................................................... 18

Scott Bridge Co. v. Wright, 883 So. 2d 1221, 1224 (Ala. 2003) ............................................... 16

State Farm Fire & Cas. Co. v. Myrick, 2008 U.S. Dist. LEXIS 38078 ...................................... 14

State Highway Dep't v. Headrick Outdoor Advertising,
    594 So. 2d 1202, 1205 (Ala. 1992) ....................................................................................... 18

Talladega City Bd. of Educ. v. Yancy, 682 So. 2d 33, 37 (Ala. 1996) ...................................... 18

Town of Brewton v. Spira, 106 Ala. 229 (Ala. 1894) ................................................................ 19

Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc.,
 80 A.D.2d 467, 469, 439 N.Y.S.2d 566, 567-568 (N.Y.A.D., 1981) ................................... 28

U.S. v. Zacks,  375 U.S. 59, 69 (U.S. 1963) .............................................................................. 16

Universal Express, Inc. v. United States SEC, 177 Fed. Appx. 52, 54
 (11th Cir. Fl. 2006) ............................................................................................................. 12

## CODES

Alabama Code §§ 16-1-1 et seq. (2001) ....................................................................................... 2

Ala. Code § 16-16-3 (2001) ..................................................................................................... 12

Alabama Code § 41-1-40 (2000) ................................................................................................ 3

Ala. Code § 41-1-41(3)(a) (2000) ............................................................................................. 3

Ala. Code § 41-1-42 ..................................................... 4, 11, 12, 13, 16, 17, 18, 19, 20, 26, 27

Ala. Code § 41-1-42(a) (2000) ............................................................ 4, 10, 15, 16, 17

## LAWS

1998 Ala. Laws 682-703 (Act No. 98-373) ........................................................... 6, 21, 24

2001 Ala. Laws 1172-73 (Act No. 2001-1107) .................................... 6, 7, 10, 21, 22, 24, 28, 29

2004 Ala. Law 1123-26 (Act No. 2004-533) ........................................... 7, 8, 10, 21, 22

## OTHER

31 C.J.S. Estoppel and Waiver § 245 (2008) ............................................................................ 17

ISDA Definitions § 8.2(c)-(d) (International Swap Dealers Assoc., Inc. 1991) ........................ 26

Restatement 2nd Contracts § 225 ............................................................................................. 26

Restatement 2nd Contracts § 250 ............................................................................................. 26

Restatement 2nd Contracts § 261 ............................................................................................. 31

Restatement 2nd Contracts § 265 ............................................................................................. 30

Plaintiff Alabama Public School and College Authority (the "Authority") submits this memorandum of law in opposition to defendant JPMorgan Chase Bank's ("JPMorgan") November 19, 2008 motion to dismiss the complaint (Doc. 13).

## INTRODUCTION

At issue in this case is the validity and enforceability of an interest rate swap option, or "swaption," originally entered into between the Authority and JPMorgan in 2002. The swaption, marketed by JPMorgan as a transaction that would provide the Authority with immediate savings on its outstanding bond obligations and effectively hedge against future rises in interest rates that could be associated with those obligations, was predicated on the Authority's future issuance of variable rate bonds to refund and refinance certain of its fixed interest rate bonds.

In truth, however, the swaption structured by JPMorgan produced none of the benefits that it promised. Even worse, the transaction was fatally flawed under Alabama law. Now, having already made millions of dollars on an impermissible transaction, JPMorgan claims that it is entitled to tens of millions more, and that the Authority's challenge to the swaption must be summarily dismissed as the complaint of a disappointed investor against whom "the market turned."

Nothing could be further from the truth. The Authority's Complaint describes at least three independently sufficient reasons for a declaration that the swaption is void under Alabama law. Each of those reasons – that the swaption was void from inception because it was not entered into in compliance with Alabama law; that the swaption was in any event not a transaction permitted by Alabama law; and that the swaption was not validated by later enacted Alabama statutes – is addressed in this Memorandum.

The Complaint also describes at least two other independently sufficient reasons – one statutory and one economic – for a declaration that the swaption is voidable. Each of those reasons – the Authority's inability to satisfy the requirements of state law for the issuance of variable rate refunding bonds, a condition precedent to JPMorgan's exercise of the swaption, and the Authority's inability to issue refunding bonds in the current financial market crisis even if it could do so under Alabama law – also is addressed in this Memorandum.

The Authority's claims present issues of fact and law that cannot be decided on the pleadings. Each requires the development of a complete factual record.

## STATEMENT OF FACTS

The pertinent facts, which must be taken as true for purposes of JPMorgan's motion to dismiss, are these:

1.      The Authority, an Alabama public corporation established pursuant to Alabama Code §§ 16-1-1 *et seq*. (2001), is charged with providing for the acquisition, construction, and equipping of public schools and other educational facilities in the State of Alabama. To effect its statutory purposes, the Authority is authorized to issue bonds secured by and payable from certain state taxes required by law to be paid into Alabama's Education Trust Fund. (Complaint ("Cplt.") ¶ 2).

2.      Among the Authority's outstanding bonds are its fixed interest rate Series 1998 Bonds issued in the original principal amount of $300,000,000 (the "Series 1998 Bonds"). (Cplt. ¶ 2). The Series 1998 Bonds reach final maturity on November 1, 2018, twenty years after the date of their original issuance. The Authority may redeem, or "call", the Series 1998 Bonds before maturity, however, and refinance them by issuing refunding bonds, provided that (a) the Series 1998 Bonds can be redeemed no earlier than ten years after the bonds were issued – in this

case, November 1, 2008 – and (b) bondholders whose bonds are redeemed and retired are entitled to receive, in addition to the principal of and accrued interest on their bonds, a "redemption" or "call" premium.[1]

3.      Alabama Code § 41-1-40 (2000) expresses the Legislature's intent to authorize certain governmental entities, including the Authority, "to take advantage of . . . instruments available to hedge against . . . interest rate, investment, payment, and similar risks" associated with "making and managing . . . investments or . . . borrowing . . . money." The "instruments" available to the Authority include interest rate swaps, described by the statute as:

> An agreement (including terms and conditions incorporated by reference therein) in the initial notional amount of $5,000,000.00 or more (which notional amount may reduce periodically under the agreement), commonly known as the following:
>
> > a. An interest rate swap agreement, an interest rate cap agreement, an interest rate floor agreement, an interest rate collar agreement, or any other similar agreement, including any option to enter into any of the foregoing.

Ala. Code § 41-1-41(3)(a) (2000).[2]  The Authority consequently "may enter into one or more swap agreements which [it] determines to be necessary or desirable in connection with, or incidental to, the conduct of its proper activities, including in connection with . . . the issuance . . . of its bonds . . . ." *Id.*  But Alabama law nevertheless prohibits any public entity, including the Authority, from entering into a swap agreement unless all required statutory

---

[1]  The redemption or call premium is intended to compensate bondholders for the loss of their investment to maturity.

[2]  An interest rate swap of the type at issue in this case is "an agreement by which one party agrees to pay the counterparty a fixed rate of interest on a notional amount for a specified period of time.  In return, the counterparty agrees to pay the first party an adjustable rate of interest on the same notional amount for the same period of time." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1469 (11th Cir. 1992).

conditions are satisfied.  Among those conditions is that

> The [Authority] first finds and determines, and certifies to the counterparty, that the swap agreement is entered into for the purpose of hedging against an interest rate, investment, payment, or other similar risk that arises in connection with or incidental to the proper activities of the governmental entity.

Ala. Code § 41-1-42(a) (2000).

4.      In 2001 JPMorgan approached the Authority to propose that the parties enter into a "swaption" with respect to the Series 1998 Bonds.  A swaption is simply an option to enter into an interest rate swap at a future date, and thus is permitted under Ala. Code § 41-1-42 if properly structured and documented.  Under the terms of the proposed swaption JPMorgan, in exchange for a specified payment to the Authority, acquired the supposed right to enter into an interest rate swap with the Authority on or after November 1, 2008 – the first date upon which the Series 1998 Bonds could be redeemed.  (Cplt. ¶ 7).

5.      JPMorgan marketed the swaption, for which it received substantial fees or other compensation, as a transaction that would (a) provide the Authority with immediate savings associated with its bond obligations; (b) represent a hedge by which the Authority could protect against the risk of future rises in interest rates; and (c) allow the Authority to refund and refinance its fixed rate Series 1998 Bonds by issuing variable rate bonds, the costs of which would not exceed (and which might be less than) the costs associated with debt service on the Series 1998 Bonds.  Indeed, the proposed swaption was predicated and conditioned upon the parties' expectation that if JPMorgan exercised its option, the Authority simultaneously would issue variable rate bonds to refund and refinance the Series 1998 Bonds, that it would make periodic fixed rate payments to JPMorgan, and that it would receive periodic variable rate payments, based on a percentage of the 1-month London Interbank Offered Rate ("LIBOR"),

from JPMorgan.  (Cplt. ¶ 7).  The transaction anticipated by the parties if the swaption was exercised, commonly referred to as a synthetic refunding, may be illustrated as follows:[3]



6.      Because it was premised upon the Authority's future issuance of variable rate bonds,  the swaption proposed by JPMorgan could not be effected in compliance with then-existing Alabama law.  Specifically, although the Authority was permitted to refinance the Series 1998 Bonds with refunding bonds after a ten-year "no call" period (*i.e.*, on or after November 1, 2008), it could do so only if the issuance of refunding bonds resulted in a reduction of at least 3% of the present value of all debt service on the bonds:

Section 7.  Refunding Bonds.

---

[3]    JPMorgan has prepared and furnished the Authority with comparable illustrations.  *See e.g.*, Declaration of Kimberly Till Powell ("Powell Decl."), filed contemporaneously with this Memorandum, at Exhibit C (Tab 2 p. 3).

Such Refunding Bonds may be sold and issued from time to time, at either public or private sale, and on such terms and conditions as the Authority shall determine to be advantageous and shall adopt and provide for in its proceedings for the sale and issuance of such Refunding Bonds; provided, however, that no Refunding Bonds shall be issued unless the present value of all debt service on the Refunding Bonds (computed with a discount rate equal to the true interest rate of the Refunding Bonds and taking into account all underwriting discount and other issuance expenses) shall not be greater than 97 percent of the present value of all debt service on the Bonds to be refunded (computed using the same discount rate and taking into account the underwriting discount and other issuance expenses originally applicable to such Bonds) determined as if such Bonds to be refunded were paid and retired in accordance with the schedule of maturities (considering mandatory redemption as scheduled maturity) provided at the time of their issuance.

1998 Ala. Laws 682-703 (Act No. 98-373) (the "1998 Act"). The 3% statutory debt service savings requirement in the 1998 Act effectively prohibited the issuance of the variable rate refunding bonds contemplated by the swaption since, by definition, the "present value of all debt service on the Refunding Bonds" would be impossible to calculate, *i.e.*, the aggregate interest payments, at a variable rate, could not be predicted.

7.      In order to proceed with the swaption, the Authority – with JPMorgan's knowledge – sought legislation to authorize its anticipated issuance of variable rate bonds to refund and refinance the Series 1998 Bonds. Act No. 2001-1107 of the Alabama Legislature (the "2001 Act"), enacted in December 2001, replaced the 3% savings test under the 1998 Act with a new formulation to prevent the issuance of refunding bonds if the result of doing so was to increase the Authority's financial obligations and required that the annual costs of the refunding bonds, as fixed by "one or more swap agreements," not exceed the annual costs associated with the Series 1998 Bonds.[4] The operative provision of the 2001 Act states:

Section 2. Notwithstanding any other provision of law, the Authority shall have the power to issue refunding obligations to refund the Authority's [Series 1998

---

[4]      JPMorgan acknowledges that the 2001 Act was adopted in order to "facilitate the swaption." Memorandum in Support of Defendant's Motion to Dismiss ("Def. Mem.") at 1 n.1.

Bonds] without regard to any statutory debt service savings requirement if, and
only if, at or prior to the time at which the Authority issues such refunding
obligations, the Authority shall have entered into one or more swap agreements,
as defined in Section 41-1-41, pursuant to which the Authority shall have fixed its
aggregate annual payment obligation (taking into account payments under such
swap agreements combined with payments on the refunding obligations) in an
amount not exceeding the aggregate annual amount payable on the [Series 1998
Bonds].

2001 Ala. Laws 1172-73 (Act No. 2001-1107) (emphasis added). (Cplt. ¶ 11).

8.     The Authority and JPMorgan entered into the swaption in March 2002, just three

months after the 2001 Act was enacted.[5]  The swaption thus owes its existence to the 2001 Act –

a statute that specifically envisioned the Authority's issuance of refunding bonds if and when

JPMorgan exercised the swaption. (Cplt. ¶ 11).

9.     A May 2004 statute enacted by the Alabama Legislature included operative

provisions similar to those of the 2001 Act, but recognized even more explicitly that interest rate

swaps such as those contemplated by the swaption were conditioned on a public issuer's ability

to issue variable rate refunding bonds:

Section 2. Legislative Findings.  The Legislature finds and declares that existing
state law authorizes the State and certain political subdivisions and public
authorities of the State to enter into financial derivative transactions such as
interest rate swaps, interest rate cap agreements, interest rate floor agreements,
interest rate collar agreements and other similar agreements, including options to
enter into such agreements. The Legislature also finds, declares and confirms that
when entered into by the State or its political subdivisions, such agreements do
not constitute debts of the governmental entity for the purposes of the Alabama
Constitution provisions limiting or proscribing the incurrence of debt by such
entities. **The ability to utilize interest rate swaps and similar transactions
frequently requires the governmental or public entity to refund certain of its**

---

[5]     The 2002 swaption is attached as an exhibit to the complaint.  Concurrently with the
parties' entry into the swaption, JPMorgan made a payment to the Authority of approximately
$2.2 million, which purported to represent consideration for its option to enter into an interest
rate swap with the Authority in the future.    JPMorgan made an additional payment of
approximately $500,000 to the Authority in January 2003 following an amendment to the
swaption under which the percentage of LIBOR on which JPMorgan was to make variable rate
payments to the Authority was reduced. (Cplt. ¶ 7).

**outstanding indebtedness at times and on terms that correlate with the terms and provisions of the swap or other agreement. The Legislature intends, by the passage of this act, to provide the State and the Authorities additional flexibility in the issuance of refunding bonds and the management of their financial affairs.**

2004 Ala. Law 1123-26 (Act No. 2004-533) (the "2004 Act") (emphasis added).

10.    Apart from the statutory linkage of the swaption to the refunding and refinancing of the Series 1998 Bonds, the swaption contract itself demonstrates that the parties' agreement was conditioned on the Authority's ability to issue variable rate refunding bonds. For example:

•    The March 13, 2002 and January 16, 2003 confirmations that memorialize and "form[ ] part of" the swaption contract are titled "Physical Settle Swaption – Series 1998 Bonds," and each notes that physical settlement of the swaption is "applicable." (Powell Decl. Ex. A (Tab 1 p. 1, Tab 2 p. 1)).[6]  In contrast to a "cash settle" swaption, where parties simply exchange fixed and variable rate cash payments, a physical settle swaption is one in which an interest rate swap actually is put in place on an underlying obligation (here, the variable rate refunding bonds to be issued by the Authority) if the swaption is exercised;

•    The confirmations specify that the first date upon which JPMorgan could exercise the swaption is November 1, 2008 – precisely the date on which the Authority could first redeem the Series 1998 Bonds and refinance them with refunding bonds. (Powell Decl. Ex A  (Tab 1 p. 2, Tab 2 p. 2)).  The coincidence of the bond redemption and swaption exercise dates demonstrates that the purpose of the swaption was to hedge against the variable interest rate on refunding bonds to be issued by the Authority if JPMorgan exercised the swaption;

---

[6]    For ease of reference, the Authority has compiled all of the confirmations included in the exhibits to the complaint and the motion to dismiss. *See* Powell Decl. Ex. A (Tabs 1-8).

- The confirmations specify that the termination date of the swaption is November 1, 2018 – the same date on which the Series 1998 Bonds finally mature. (Powell Decl. Ex A (Tab 1 p. 3, Tab 2 p. 3)). The coincidence of the swaption termination and bond maturity dates demonstrates that the swaption, if exercised by JPMorgan, was to result in the placement of an interest rate swap on refunding bonds, since a variable to fixed interest rate swap such as envisioned by the swaption would make no sense for the fixed rate Series 1998 Bonds or any refunding bonds issued as fixed rate bonds;

- The confirmations specify that the notional principal amounts on which the fixed and variable payments are to be made are precisely the same as the principal amount of the refunding bonds that the Authority was to issue if JPMorgan exercised the swaption. (Powell Decl. Ex. A (Tab 1 p. 2, Tab 2 p. 2)). Indeed, the principal amount of the refunding bonds if the swaption was exercised as of November 1, 1998 **actually was calculated** by JPMorgan – both before and after the swaption contract was executed – as the sum of (1) the principal amount of the Series 1998 Bonds as of November 1, 2008, (2) the redemption premium payable to Bondholders if the Series 1998 Bonds were redeemed and refunded as of the November 1, 2008 swaption exercise date, and (3) the anticipated underwriting and related costs of issuing refunding bonds;[7]

---

[7] *See* Powell Decl. Ex. C (Tab 1 p. 13). JPMorgan's calculation was as follows:

| | |
|---|---|
| Series 1998 Bond Principal Redemption | $278,910,000 |
| Redemption Premium | 4,183,650 |
| Costs of Insurance and Underwriter's Discount | 621,350 |
| Total: | $283,715,000 |

This total matches the total notional amount reflected on Annex 1 to the March 2002 and January 2003 swaption confirmations. (Powell Decl. Ex. A (Tab 1, Tab 2)). JPMorgan's calculations, contained in presentations it made to the Authority, are not attached as exhibits to the Complaint. Their content, however, certainly is a subject of the Complaint's allegations (*See, e.g.*, Cplt. ¶ 7), which must be taken as true. References to the presentations in this Memorandum simply

- JPMorgan's written presentations to the Authority contain its explicit acknowledgement and understanding that if it exercised the swaption, the Authority would "simultaneously deliver[ ] variable rate refunding bonds and redeem[ ] [the Series 1998 Bonds]" (Powell Decl. Ex. C (Tab 1 p. 12) (*accord* Tab 2 p. 3)). JPMorgan's written presentation materials repeatedly included liquidity and remarketing fees for the Authority's anticipated variable rate refunding bonds – the very costs JPMorgan now insists are not included for purposes of the "aggregate annual obligations" test under either the 2001 or 2004 Acts[8] – as costs that would be incurred in connection with the refunding bonds. (Powell Decl. Ex. C (Tab 1 pp. 5, 14)). No liquidity or remarketing fees are applicable to the Series 1998 Bonds; such fees are associated only with variable, not fixed rate bonds, and are estimated because they relate to a planned issue of variable rate bonds **in the future**.

11.     As documented, the parties' March 2002 agreement (as amended in 2003) had characteristics commonly associated with a swaption. As proposed by JPMorgan, however, and as structured, the transaction departed materially from the manner in which a swaption typically operates.   For example, as noted in paragraph 3 above, Ala. Code § 41-1-42 permits the Authority to enter into a swaption provided that, among other things, the purpose of the transaction is to hedge against an interest rate or other similar risk.  In this case, the payments made by JPMorgan in 2002 and 2003 were designed to represent savings that the Authority would expect to receive upon a later refunding of the Series 1998 Bonds, and in that sense were described by JPMorgan as a hedge against a rise in interest rates between March 2002 and

---

illustrate that the Complaint's factual allegations will be supported by the evidentiary record in this case.

[8] *See* Def. Mem. at 16-18.

November 2008, when refunding bonds could first be issued.  Yet the $2.7 million the Authority received from JPMorgan represented less than 1% of the outstanding amount of the Series 1998 Bonds.  Taking into account the redemption premium and the costs of issuing refunding bonds – over $4.8 million – the Authority could realize virtually no savings in connection with the supposed hedge offered by the swaption.  Indeed, the effect of the swaption was that the Authority sold to JPMorgan its right to potential future benefits that would result from a decline in long-term interest rates in exchange for avoiding the risk of an extraordinary and historically unprecedented increase in long-term rates.  That supposed risk was so remote as to have been no risk at all, and the swaption consequently was not a legitimate hedging transaction within the meaning of Ala. Code § 41-1-42.  (Cplt. ¶ 8).

12.    The fixed rate payment schedule specified in the swaption likewise departed materially from the payment schedule commonly specified in legitimate swaption transactions. Swaptions on municipal bonds typically are structured so that payments match the declining balances of an existing or anticipated bond issue.  Under such a structure, the Authority's fixed rate payment obligations would have been spread roughly equally over the ten-year period following JPMorgan's exercise of the swaption.  In this case, however, the payment schedule called for JPMorgan to receive more than 50% of the fixed rate payments due from the Authority – over $35 million – within a year after exercising the swaption and more than 95% of such payments – a total of more than $66 million – within two years of exercise.  By structuring the Authority's fixed rate payments in this manner, JPMorgan's exercise of the swaption was for all intents and purposes a certainty, since by doing so it would receive what amounts to a $66 million loan from the Authority with effectively no rate of return or implied interest rate.  The

11

Authority has no statutory or other legal authority to make loans, however, much less to make loans permissible by labeling them as interest rate swaps or swaptions. (Cplt. ¶ 9).

13.     Apart from (and perhaps because of) its structural infirmities, the swaption was not documented in accordance with the requirements of Alabama law. As noted in paragraph 3 above, the law in question, Alabama Code § 41-1-42, provides in pertinent part that

> **[ ] No governmental entity shall enter into any swap agreement unless all of the following occur:**
>
> **The governmental entity's governing body first finds and determines and certifies to the counterparty, that the swap agreement is entered into for the purpose of hedging against an interest rate, investment, payment, or other similar risk that arises in connection with or incidental to the proper activities of the governmental entity.**

(emphasis added). No such finding, determination, or certification with respect to either the March 2002 swaption or the January 2003 amendment was included in the transcript of documents provided to the parties in 2002 and 2003 and to the best knowledge of the current officers and representatives of the Authority[9], no such finding, determination, or certification was made.[10] (Cplt. ¶ 10). The statutorily required certifications have been provided in other state swap transactions, including transactions based on underlying ISDA Master Agreements such as the one entered into by the Authority and JPMorgan.[11] In the absence of the required

---

[9]     The Authority's governing body is made up of the Governor, the State Superintendent of Education, and the Director of Finance. Ala. Code § 16-16-3 (2001). No member of the Authority's current governing body was a member at the time the swaption documents were executed.

[10]     Judging by its motion, JPMorgan also has not located the required finding, determination, and certification. Nor has JPMorgan suggested that such a certification exists.

[11]     *See, e.g.*, Powell Decl. Ex. B. This certificate was issued in connection with a derivative transaction entered into by the State of Alabama in 2004. The certificate is a public document, and the Court accordingly may take judicial notice of it for purposes of a motion to dismiss. *Universal Express, Inc. v. United States SEC*, 177 Fed. Appx. 52, 54 (11th Cir. 2006); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

finding, determination and certification, the swaption does not comply with the requirements of Alabama Code § 41-1-42. (Cplt. ¶ 10).

14.     In June 2008 JPMorgan notified the Authority that it intended to exercise the swaption as of November 1, 2008, and that it consequently expected the Authority on that date to issue variable rate refunding bonds for which JPMorgan would provide (*i.e.*, physically settle) a variable to fixed rate swap. Central to the parties' performance under the swaption, however, was the Authority's actual ability to issue variable rate refunding bonds if JPMorgan exercised the swaption. The "aggregate annual payment obligation" to be calculated under the 2001 Act includes liquidity support costs and remarketing fees typically associated with the issuance of variable rate bonds – a fact that JPMorgan recognized and explicitly acknowledged in documents it furnished to the Authority after the execution of the swaption contract. (Powell Decl. Ex. C (Tab 1 pp. 5, 13-14; Tab 4 p. 3)). As of November 1, 2008, no liquidity support facility[12] was available at a cost which, when coupled with the previously described fixed rate payments due to JPMorgan under the swaption, would not substantially exceed the aggregate amount payable on the Series 1998 Bonds. JPMorgan was aware of that fact when it notified the Authority in June 2008 that it intended to exercise the swaption. (Cplt. ¶ 11).

---

[12]     Variable rate bonds such as those anticipated to be issued by the Authority generally include a bondholder "put" or "tender" right pursuant to which a holder of such bonds, on very short notice (frequently 7 days), may require the issuer to repurchase the holder's bonds for the face value thereof plus interest accrued to the date of tender. As a condition to the initial issuance and sale of this type of bond, the market generally requires the issuer (*i.e.,* the Authority) to arrange for a liquidity facility from an outside source, typically a commercial bank, that will provide a reliable source of funds with which to repurchase any bonds so tendered to the issuer. Liquidity facilities may take any of several forms. but most commonly are irrevocable letters of credit or standby bond purchase agreements. Without such a liquidity facility, most types of variable rate bonds cannot be sold.

## ARGUMENT AND AUTHORITY

### I.    STANDARD ON MOTION TO DISMISS

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint include only a "short and plain statement of the claim showing that the pleader is entitled to relief ...." *Gamble v. PinnOak Res. LLC*, 511 F. Supp. 2d 1111, 1125 (N.D. Ala. 2007) (internal citations omitted) (denying motion to dismiss) ("A plaintiff must provide the grounds of his entitlement, but Rule 8 does not require 'detailed factual allegations.'").

When deciding a motion to dismiss under Rule 12(b)(6), a court must assume that all factual allegations in the complaint are true and must construe those allegations in the light most favorable to the plaintiff. *Gamble*, 511 F. Supp. 2d at 1125.  To prevail on a motion to dismiss for failure to state a claim, a defendant must demonstrate that the complaint fails to provide sufficient notice of a proper claim and the grounds upon which the claim rests. *Id.*  A court can grant a motion to dismiss only if it concludes that, taking all alleged facts as true, there is no right to relief as a matter of law.[13]

JPMorgan cannot seriously contend that the facts alleged in the Complaint could under no circumstances entitle the Authority to a declaration that the swaption is void, voidable, or otherwise incapable of performance.  To the contrary, the factual allegations and claims for relief in the Complaint far exceed the minimal pleading threshold established by Rule 8.  And, as the Authority establishes below, none of its claims can be dismissed as a matter of law under Rule 12(b)(6).

---

[13]    This Court recently confirmed the applicable standard for considering a motion to dismiss.  *State Farm Fire & Cas. Co. v. Myrick*, 2008 U.S. Dist. LEXIS 38078, *5 (M.D. Ala. May 9, 2008) (denying a motion to dismiss and observing that the complaint's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact.)" (citations omitted)).

## II.    THE SWAPTION IS VOID

### A.    The Absence of the Finding, Determination and Certification Required by Alabama Law Voids the Swaption

#### 1.    The Statute Requires Certification

Alabama Code §41-1-42(2)(a) (2000) contains an explicit and unambiguous directive to public entities such as the Authority:

> No governmental entity shall enter into any swap agreement unless **all of the following occur:**
>
> (a)    The governmental entity's governing body first **finds and determines, and certifies** to the counterparty, that the swap agreement is entered into for the purpose of hedging against an interest rate, investment, payment, or other similar risk that arises in connection with or incidental to the proper activities of the governmental entity. ...

(emphasis added).  As noted in the Statement of Facts, no such finding, determination, and certification is to be found in the swaption closing documents provided to the parties.[14]  The Authority expects the evidence to show that swap transactions entered into by other Alabama governmental or public entities include the required certification as part of the transactional closing documents.  (*See, e.g.,* Powell Decl. Ex. B).  JPMorgan's argument that it can rely on certifications, and on inaccuracies in certifications (Def. Mem. at 6 and 9), is thus entirely circular, since the argument presumes the existence of a certification in the first instance.  The absence of the statutorily required finding, determination, and certification establishes – at a minimum – an issue of fact as to whether the swaption was void *ab initio*.

---

[14]    Failure to make the required finding and certification frustrates the Legislature's intent to ensure that public entities employ swaps for legitimate purposes and that they not engage in risky, speculative, or otherwise impermissible transactions.

###### 2.    The Representations Upon Which JPMorgan Relies Do Not Satisfy, and Cannot be Substituted for, the Statutorily Required Certification

JPMorgan claims that a legal opinion by the Authority's counsel, together with various assurances in the form ISDA swaption documents can be cobbled together as a matter of law to substitute for the actual finding, determination, and certification required by Ala. Code §41-1-42. The plain language of the statute authorizes no such substitution, however.    Nor does the statutory language suggest, as JPMorgan asserts, that a boilerplate negative representation[15] – *i.e.*, a representation that a transaction is not entered into for speculative purposes – can satisfy the legislature's plain, unmistakable direction that a public entity affirmatively state and certify the specific purpose for which it is entering into a swap agreement.    For that reason, failure to comply with the certification requirement cannot be excused as a mere formality.    *See generally Alabama Power Co. v. City of Fort Payne*, 187 So. 632, 635-640 (Ala. 1939) (upholding a challenge to a bond financing based on the municipality's failure to comply with a statutory requirement conditioning the bond issuance on a finding of fact) ("One of the reasons why the Legislature required that the Board should make this finding, was its very laudable purpose to guard against the wholesale and indiscriminate issuance and sale of bonds by municipalities, when there was no real necessity therefor.").

Unsurprisingly, no principle of statutory construction supports JPMorgan's reading of §41-1-42.    *See, e.g., U.S. v. Zacks,*    375 U.S. 59, 69 (U.S. 1963) (citations omitted) ("It is, of course, our duty to give effect to all portions of a statute if that is possible ... in furthering the intent of the legislature, not overriding it."); *Scott Bridge Co. v. Wright*, 883 So. 2d 1221, 1224 (Ala. 2003) (citation omitted) ("Suffice it to say that it is quite a leap from liberally construing

---

[15]    The "non-speculation" provision in the ISDA documents on which JPMorgan relies is part of the ISDA form for swaps entered into anywhere in the world.  It was not designed to be, and is not, responsive to the certification requirement of §41-1-42(2)(a).

one word in [a statute] to completely writing three words out of the statute. This Court simply cannot ignore words in a statute except where it is certain that the legislature could not possibly have intended the words to be in the statute, and that the rejection of them serves merely as a correction of careless language.").

To accept JPMorgan's reading of §41-1-42(2)(a), the Court would have to (a) engraft additional language onto the statute – allowing a public entity either to "find and determine, and certify to the counterparty" that a swap is entered into for one of the permissible statutory purposes or instead simply to represent to the counterparty that the swap is not entered into for speculation; or (b) eliminate from the statute the words "finds and determines, and certifies," as well as the specified permissible reasons for entering into the swap. JPMorgan can offer no evidence, much less demonstrate as a matter of law, any legislative intent that would permit the Court to rewrite the statute in that manner. JPMorgan similarly can offer no evidence, much less demonstrate as a matter of law, either that the straightforward provisions of §41-1-42 are an example of careless legislative language in need of correction by the Court or that the Legislature actually intended to use additional or different words in the statute.

Moreover, JPMorgan is charged with knowledge that a finding, determination, and certification were required under Alabama law. *See, e.g., County Board of Education v. Slaughter*, 160 So. 758, 760 (Ala. 1935) (a party dealing with a state actor must be held to have known the limits of the state's authority and when it is transcending those limits); *Birmingham v. Lee*, 48 So. 2d 47, 55 (Ala. 1950) ("Persons dealing with agencies of government are presumed to know the legal limitations upon their power"); *see also* 31 C.J.S. *Estoppel and Waiver* § 245 (2008) ("Persons dealing with public officers and agents are bound by the constructive notice of the law and the public records as to the measure of their powers and functions."). In short,

because it is legally presumed to have knowledge of the certification requirement of §41-1-42, JPMorgan cannot argue – and the Court certainly cannot conclude as a matter of law – that the swaption was entered into in compliance with Alabama law.[16]

### 3. Estoppel Cannot Be Invoked to Require the Authority to Exceed Its Statutory Authority

A state actor such as the Authority cannot be estopped where, as in this case, it (a) "question[s] the legality of a contract into which it had no authority to enter" or (b) "seeks to avoid doing that which it has no authority to do." *Perkins v. Shelby County*, 985 So. 2d 952, 956 (Ala. 2007) (noting, among other things, that estoppel "is only infrequently applied against municipal corporations" (*citing Talladega City Bd. of Educ. v. Yancy*, 682 So. 2d 33, 37 (Ala. 1996)).[17] The Complaint and the record at this stage establish with equal clarity that the certification requirement of §41-1-42 was not met in this case. First, there can be no doubt that certification is required by the statute. Second, the Authority appropriately seeks to rescind a transaction that it had no authority to enter into in the first place. Because the doctrine of estoppel is unavailable to validate a transaction that fails to comply with statutory requirements, and consequently is against public policy (*Perkins*, 985 So. 2d at 957), the doctrine simply has no application in this case.

Estoppel in any event is an inappropriate basis on which to dismiss a complaint where, as here, its application involves questions of both law and fact. *See Imperial Group, Ltd. v. Lamar*

---

[16]     The Authority expects the evidence to show that JPMorgan in fact was well aware of the provisions of §41-1-42. Of course that is a matter for discovery, not for a motion to dismiss.

[17]     *See also State Highway Dep't v. Headrick Outdoor Advertising*, 594 So. 2d 1202, 1205 (Ala. 1992) ("[T]he doctrine of estoppel may not authorize a city to do that which the city had no authority to do."); *County Board of Education v. Slaughter*, 160 So. 758, 760 (Ala. 1935) (a governmental entity created by law is endowed with certain clearly defined rights and powers, and "can exercise only those powers which are expressly conferred upon it, or necessarily incident thereto").

*Corp.*, 347 So. 2d 988, 989 (Ala. 1977) (citations omitted) ("Unless only one reasonable inference can be drawn from the evidence, estoppel is a question for the triers of the facts, the jury or the trial court."). To the extent the failure to comply with §41-1-42 requires the resolution of any issue of fact that could validate the swaption in the absence of certification, such a resolution can be achieved only on the basis of an evidentiary record that does not yet exist.

Neither *Town of Brewton v. Spira*, 17 So. 606 (Ala. 1894), nor *Brown-Crummer Inv. Co. v. Florala*, 55 F.2d 238, 242 (M.D. Ala. 1931), upon which JPMorgan relies, supports summary dismissal of the Authority's claim. Both cases stand simply for the unexceptional (and undisputed) proposition that innocent third-party bondholders may rely on the validity of negotiable instruments they have purchased. Unlike the bondholders in those cases, however, JPMorgan's relationship with the Authority hardly can be characterized as that of an innocent third-party. Instead, JPMorgan proposed, structured, and engineered the swaption with knowledge of both the limitations on the Authority's power and the conditions the Authority was required to satisfy in order to exercise that power. In addition, *Spira* was decided only after a trial on the merits – not on a motion to dismiss – and the dismissal in *Florala* was based on the unwillingness of the defendant municipality to disgorge the benefits of the disputed bond issue. *Id.* (citing *Spira*, 17 So. at 606-608.) ("The city and the landowners, retaining the benefits as they do, are estopped to set up any defenses which they might have had."). Here, by contrast, the Authority's request that the swaption be declared void or be rescinded is expressly conditioned upon its repayment of all amounts received from JPMorgan, together with interest.[18] For these

---

[18] The Authority is "ready, willing, and able to refund all payments made by JPMorgan pursuant to the swaption, together with any interest thereon at the legal rate the Court may determine to be appropriate." (Cplt. ¶ 13).

reasons, estoppel cannot be invoked by JPMorgan to validate a contract that – on the basis of the Complaint and the current record – the Authority could not have entered into without first making the required finding, determination and certification of purpose.

**B.     Despite Its Label, the Contract Structured By JPMorgan Is Not a Lawful Swaption Under Alabama Law**

The Authority's Complaint details a number of respects in which the contract that JPMorgan labels a swaption departs materially from conventional and commonly understood interest rate swap options. (Cplt. ¶¶ 8-9). At the heart of the Authority's allegations on this issue is that, despite its label, the so-called swaption was not authorized by Ala. Code §41-1-42 because it was not undertaken "for the purpose of hedging against an interest rate, investment, payment, or other similar risk . . .aris[ing] in connection with or incidental to [its] proper activities." The Authority has alleged more specifically that the transaction provided no hedge; was not an option at all; and effectively was nothing more than a huge loan to JPMorgan with effectively no rate of return – a loan which the Authority had no legal authority to make (and from which, incidentally, JPMorgan benefited at the outset by receiving millions of dollars in fees or other compensation). The merits of the Authority's claim can be assessed only with the aid of a fully developed factual record and, in all likelihood, with the aid of expert testimony. The claim simply is not amenable to disposition on a motion to dismiss. And, for the same reasons JPMorgan cannot enforce a contract that exceeds the Authority's statutory authority (*supra* at Section II), the Authority's challenge to the validity of the swaption cannot otherwise be dismissed as a matter of law under Rule 12(b)(6).

**C.    The Swaption Does Not Satisfy the Aggregate Annual Obligation Test Under the 2001 Act**

The 2001 Act authorized the Authority to issue variable rate refunding bonds without complying with the 3% debt service savings requirement of the 1998 Act if the Authority previously has entered into a swap agreement, the effect of which, when combined with the variable rate refunding bonds, "fixed" the Authority's "aggregate annual payment obligation" (*i.e.,* the amounts in Column B below) each year at a level no greater than its "aggregate amount payable" each year on the refunded bonds (*i.e.*, the amounts in Column A below):

| Column A<br>Refunded Series 1998 Fixed Rate Bonds | Column B<br>Variable Rate Refunding Bonds |
|---|---|
| Scheduled Bond Principal<br>+ Fixed Bond Interest | Scheduled Bond Principal<br>+  Variable Bond Interest<br>+  Liquidity Support Costs<br>+  Remarketing Fees<br>+  Fixed Swap Payments<br>−  Variable Swap Receipts |
| = Aggregate Annual Amount Payable | = Aggregate Annual Payment Obligation |

As JPMorgan consistently acknowledged before this suit was filed, the term "aggregate annual payment obligation" includes liquidity and support costs associated with the Authority's ability to issue and, if necessary, remarket its bonds. (Cplt. ¶ 11) (Powell Decl. Ex. C (Tab 1 pp. 5, 14)). As of November 1, 2008 (and as of today), those costs, coupled with fixed rate payments due to JPMorgan under the swaption, substantially exceed the aggregate amount payable on the Series 1998 Bonds that were to be refunded by virtue of JPMorgan's exercise of the swaption.

Read literally, the 2001 Act is impossible to effectuate – the aggregate annual payment obligation relating to the refunding bonds (the Column B amounts) can never be "fixed" because two of its components (the bond interest payments and swap receipts) are variable. The 2004 Act sought to correct this infirmity in the 2001 Act by allowing an assumption that the variable

bond interest payments and the variable rate swap receipts would be equal and therefore would cancel each other out. The 2004 Act thus authorized the Authority to issue refunding bonds in the form of variable rate bonds if the Authority previously had entered into a swap agreement the effect of which, when combined with the refunding bonds, is to "determine" its "annual aggregate annual payment obligation" (the Column B amounts) each year at a level "not expected to exceed" the "aggregate amount payable" on the refunded bonds (the Column A amounts).[19]

Thus, variable rate refunding bonds coupled with a swap are permitted only when the "aggregate annual payment obligation" is fixed and does not exceed (2001 Act) – or has been the subject of a determination that it is not expected to exceed (2004 Act) – "the aggregate annual amount payable" on the Refunded Bonds. Although the Acts contain slightly different language, both provide the same boundary – public issuers such as the Authority may issue variable rate refunding bonds only when doing so will not increase their debt service and related obligations See e.g. 2004 Act § 4 ("It is the Legislative intent that savings realized by this bill . . . may be utilized to reduce debt service appropriations . . . ").[20]

---

[19]    Compare the 2001 Act:
[T]he Authority **shall have fixed** its aggregate annual payment obligation (taking into account payments under such swap agreements combined with payments on the refunding obligations) in an amount **not exceeding** the aggregate annual amount payable on the Refunded Bonds.
(emphasis added) with the 2004 Act:
[T]he Authority . . . **shall have determined** its aggregate annual payment obligation (taking into account payments under such swap agreements combined with payments on the refunding obligations) in an amount **not expected to exceed** the aggregate annual amount payable on the Refunded Bonds.
(emphasis added).

[20]    JPMorgan misreads the Complaint when it suggests that the 2004 Act is the "[l]aw that the Authority claims bars it from issuing refunding bonds." (Def. Mem. p. 16). *See, e.g.,* (Compl. p. 6 ¶ 11). JPMorgan no doubt realizes the absurdity of claiming that a statute can apply retroactively to an expectation of one of the parties that was formed years before the statute was

Putting aside for the moment its change of position on the matter, JPMorgan's argument that calculation of the "aggregate annual payment obligation" excludes liquidity, support, and other transaction expenses also is at odds with the plain meaning of the 2001 and 2004 Acts and ignores the economic reality of the swaption.[21]   The same is true of its argument that even if the aggregate annual payment obligation includes costs that leave the Authority unable to comply with the applicable cost test, it does not matter so long as the Authority determined at the time the swaption was entered into that its aggregate annual payment obligation was not expected to exceed the amount payable on the Series 1998 Bonds.  (Def. Mem. pp. 17-18).  But even if JPMorgan ultimately could prevail on either argument, neither is appropriate for resolution on a motion to dismiss.

Even if the Court were prepared to ignore the contradictions between JPMorgan's current position and its previous acknowledgement that liquidity and support costs are included for purposes of the statutory savings test, and then to parse through the strained statutory analysis

---

enacted.  Indeed, if JPMorgan contends that the swaption execution date triggers application of the statute, the only statute on record at the time was the 2001 Act.  Since the swaption was entered into before September 30, 2002 – the sunset date of the 2001 Act – the 2001 Act should apply and, if it actually authorized a comparative costs test, the test could not be met.  The 2004 Act is silent on whether it replaces, modifies or otherwise impacts, in whole or in part, the 2001 Act.  For these reasons, at the very least there are factual questions concerning the application of the relevant statutes that cannot be resolved on a motion to dismiss.

[21]   JPMorgan essentially claims that "debt service" (*i.e.,* repayment of principal and interest) is equivalent to "aggregate annual payment obligation."  Statutory construction requires a presumption that use of the term "debt service" in the statute, but omission of the term from the description of "aggregate annual payment obligation," was purposeful.  In other words, while the 2004 Act uses the words "debt service," it does not do so in connection with calculating the aggregate annual payment obligation.  Had the Legislature intended to use "debt service" - words with which it obviously was familiar – in place of "aggregate annual payment obligation," it would have done so.  JPMorgan also appears to argue that "aggregate" means "some" rather than "sum" (Def. Mem. p. 17, fn. 7).   The statutory provisions it cites, however, provide no justification for the exclusion of liquidity costs and remarketing fees from the Authority's aggregate annual obligation.

that JPMorgan urges, that analysis wholly fails to support the notion that the Authority can comply with statutory savings requirements by excluding such costs. Adopting JPMorgan's approach would be analogous to saying that a homeowner may disregard the "points" charged by a mortgage broker when determining whether or not he or she will save money through refinancing. Moreover, JPMorgan's reading of the 2004 Act would mean that the Authority could not only ignore the 3% debt service savings requirement of the 1998 Act, but also that it could issue refunding bonds that actually increase its debt obligations. This obviously was not the intent of the Legislature when it enacted the 2004 Act. Furthermore, it simply cannot be assumed – particularly on a motion to dismiss – that the Legislature provided the Authority with the "additional flexibility" to disregard the plain meaning of the actual provisions of the 2004 Act by requiring a determination of costs and then permitting the Authority to ignore significant factors in determining those costs.

The point of course is that the Court cannot – and, more important, need not – decide now whether the Authority is correct when it alleges that it cannot comply with the 2001 (or, if it applies, the 2004) Act. The Complaint's allegations that the Authority cannot satisfy the applicable aggregate annual payment obligation test must be assumed to be true on JPMorgan's motion to dismiss. JPMorgan's arguments are just that – arguments. They simply do not support summary dismissal of the Complaint.

## III.    THE SWAPTION IS VOIDABLE

Even if the Court were to conclude as a matter of law that the swaption cannot under any circumstances be declared void under Alabama law, it nevertheless is voidable for any or all of the reasons described in the Complaint. The Authority addresses those reasons below.

A.    **The Authority's Issuance of Refunding Bonds was a Precondition for, and an Integral Part of, the Swaption**

In view of the swaption documents attached to the Complaint; the swaption documents that relate to other bonds issued by the Authority;[22] and the relevant Alabama statutes, JPMorgan's argument that the swaption was not predicated upon the issuance of refunding bonds is, with all due respect, bizarre. And, in view of the written materials JPMorgan generated and presented to the Authority years **after** the swaption documents were executed, its insistence that the swaption is unrelated to the Authority's issuance of refunding bonds is equally bewildering. Without question, the basis – indeed the very essence of this transaction – was the Authority's anticipated redemption and refinancing of the Series 1998 Bonds.[23]

JPMorgan's insists that the issuance of refunding bonds "is beyond the scope of the Swaption Agreement" (Def. Mem. at 13). But that claim is belied by the swaption contract; by JPMorgan's own documents; and by the applicable Alabama statutes. Separately or taken together, all demonstrate that JPMorgan's exercise of the swaption in fact was dependent on the Authority's ability to refinance the Series 1998 Bonds with variable rate refunding bonds.

In short, the Authority's ability to issue variable rate refunding bonds was a condition precedent to JPMorgan's exercise of the swaption. A condition precedent is "an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises." *Lindenbaum v. Royco Property Corp.*, 165 A.D.2d 254, 259 (N.Y. App. Div.

---

[22]    Those documents accompany JPMorgan's motion.

[23]    Without belaboring the question of how its theories are labeled, the Authority's claim is less one of mutual mistake, as JPMorgan suggests, than of failure of a condition precedent to the exercise of the swaption. Thus, JPMorgan's insistence that the complaint should be subject to a heightened pleading standard is irrelevant. By its motion, JPMorgan at least has demonstrated that it understands (albeit that it disputes) the Authority's claim.

1991) (citing Calamari and Perillo, <u>Contracts</u>, § 138; Restatement of Contracts, § 250[a]).[24]  The

effect of a failure of condition precedent is that "no operative or binding contract ever came into

existence." *Hicks*, 180 N.E.2d 425 at 428.; *see also* Restatement (Second) of Contracts § 225

("Performance of a duty subject to a condition cannot become due unless the condition occurs or

its non-occurrence is excused").

To begin, the swaption is replete with evidence that variable rate refunding bonds were to

be issued by the Authority if JPMorgan exercised the swaption.  First, each confirmation

describes a "physical settle swaption," an unmistakable reference to the variable to fixed interest

rate swap to be placed on a synthetic refunding of the identified fixed rate bonds.[25]  As a matter

of fact and logic, no variable to fixed interest rate swap could be placed on the Authority's Series

1998 Bonds because, by definition, there is no "interest rate" fluctuation on those fixed rate

bonds and therefore no "interest rate risk" to "hedge against" within the meaning of Alabama

Code §41-1-42.  If the swaption did not call for the issuance of variable rate refunding bonds, the

phrase "physical settle swaption" simply would have no meaning.  Similarly, if the Authority

sought to hedge against some other investment or interest rate risk, the swaption would not have

included a specific reference to the fixed rate Series 1998 Bonds.  And if, as JPMorgan argues,

the swaption truly is unrelated to the issuance of refunding bonds, it is void as a matter of law

---

[24]  New York law applies to the construction and interpretation of the swaption contract. Alabama law applies to most or all of the Authority's challenges to the contract's validity.

[25]  "If 'Physical settlement' is specified to be applicable to the Option, it means that Seller grants to Buyer pursuant to the Option the right to cause the Underlying Swap Transaction to become effective … [i]f 'Cash Settlement' is specified to be applicable to the Option, it means that Seller grants to Buyer pursuant to the Option the right to cause Seller to pay Buyer the Cash Settlement Amount, if any, in respect of the Underlying Swap Transaction on the Cash Settlement Payment Date."  ISDA Definitions § 8.2(c)-(d) (1991).

under Ala. Code §41-1-42 because it does not constitute an identifiable "hedge against . . . an interest rate, investment, payment, [or] similar risk."[26]

Second, it is not mere happenstance that the first "exercise date" specified in the swaption confirmations is November 1, 2008. That date, rather than any of the other 3,649 days between March 13, 2002 and November 1, 2008, was selected because it is the first date as of which the Series 1998 Bonds could be redeemed and refinanced with refunding bonds. Any doubt about this is obviated by the confirmations for other swaptions that accompany JPMorgan's motion to dismiss. Those confirmations memorialize swaptions entered into between the Authority and JPMorgan in respect of three other series of fixed interest rate bonds issued by the Authority in 1999. The first exercise date for each of those swaptions also is the first date on which the related fixed rate series of bonds first could be redeemed and refinanced with refunding bonds.[27]

Third, each swaption termination date coincides with the final maturity date for each related series of fixed rate bonds.[28] This is precisely what one would expect if the swaptions are predicated on the issuance of refunding bonds, which of course would not be issued after the fixed rate bonds mature.

Fourth, the notional amounts specified in the confirmations likewise were not selected by accident. Calculated by JPMorgan, they are the sum of (1) the principal amount of the Series 1998 Bonds as of the date of redemption/swaption exercise; (2) the redemption premium payable

---

[26]    The fact that the swaption was conditioned on the Authority's ability to issue refunding bonds of course was the basis for the Authority's representations that the swaption was not undertaken for speculative purposes and for the opinion by its counsel that the swaption was otherwise permissible under Alabama law.

[27]    *See* Powell Decl. Ex. A (p. 2 on each of Tabs 1-8).

[28]    *See* Powell Decl. Ex. A (p. 3 on each of Tabs 1-8).

to the Series 1998 Bondholders; and (3) the costs of issuing refunding bonds.[29] They thus confirm precisely what the parties intended – that refunding bonds would be issued by the Authority if JPMorgan exercised the swaption.

JPMorgan's own statements after the swaption was entered simply cannot be reconciled – particularly on a motion to dismiss – with its claim that the Authority's issuance of refunding bonds "is beyond the scope" of the swaption.[30] For example, in addition to other references to the anticipated issuance of variable rate bonds in its July 2005 presentation to the Authority (Powell Decl. Ex. A (Tab 1 pp. 5, 12-14)), JPMorgan acknowledged that if it decided to exercise the swaption, the Authority "can either unwind the swap by making or receiving a termination payment reflecting then-current market conditions, or move forward with the synthetic refunding of the [Series 1998 Bonds]."[31]

Finally, as discussed in detail in the Statement of Facts, specific legislation – in the form of the 2001 Act – was necessary to enable the Authority to enter into the swaption. The 2001 Act plainly contemplates a variable rate refunding with an appropriate swap by allowing such a

---

[29] JPMorgan calculated the notional amounts of the swaptions related to the Authority's Series 1999 A, C, and D bonds in the same fashion. *See* Powell Decl. Ex. A (Tab 1 pp. 15, 17, 19)).

[30] Even if the Court were convinced as a matter of law that the condition precedent of the Authority's ability to issue refunding bonds was not obvious on the face of the swaption documents and by reference to governing Alabama law, extrinsic evidence is admissible to prove the existence of the condition. *See, e.g., Hicks v. Bush*, 180 N.E.2d 425, 427, (N.Y. 1962); *Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc.*, 80 A.D.2d 467, 469, 439 N.Y.S.2d 566, 567-568 (N.Y. App. Div., 1981). Moreover, the presence of a merger clause in the swaption contract does not bar parol evidence when such evidence "is offered to prove a condition precedent before the contract could become effective." *Id.* at 469.

[31] The evidence in this case will show that the Authority was to have the choice of two viable options, termination of the swaption or issuance of refunding bonds. In other words, the Authority did not assume the risk of a termination payment if it was unable to issue refunding bonds by virtue of statutory limits on its authority or market conditions that prevented it from securing a liquidity facility.

refunding without satisfying the 3% debt service savings requirement otherwise applicable to refundings by the Authority under Alabama law. And, as also discussed in the Statement of Facts, the 2004 Act included an express finding by the Legislature that "[t]he ability to use interest rate swaps . . . frequently requires the governmental or public entity to refund certain of its outstanding indebtedness . . . ."

In sum, the Authority has more than adequately pleaded facts which, taken as true (as they must be), state a claim that the swaption was terminated or is voidable by virtue of the failure of a condition precedent. No more is necessary to defeat JPMorgan's motion to dismiss.

### B.     The Authority's Inability to Issue Refunding Bonds Frustrates the Purpose of the Swaption

Assuming for the sake of argument that the Court were to find that the swaption was validly entered into in 2002 and that any applicable savings test has been satisfied, the Authority's practical inability to issue variable rate refunding bonds under currently prevailing market conditions frustrates the purpose of the swaption and renders performance under its terms impossible.

### 1.     A Liquidity Facility Is Unavailable to the Authority

The essential purpose of the swaption was to effect a savings as narrowly dictated by statute. Central to the Authority's performance under the swaption was its actual ability to issue variable rate refunding bonds if JPMorgan exercised the swaption. To market such bonds, the Authority is required to arrange for a liquidity facility from an outside source, which may take any of several forms but most commonly an irrevocable letter of credit or standby bond purchase agreement. (Statement of Facts ¶ 14 n. 12). Without the liquidity facility, most types of variable rate bonds cannot be sold. *Id.* As of November 1, 2008, no liquidity support facility was available to the Authority at a cost which would effectuate the purpose of the swaption. The

Authority will prove that in an effort to structure a refunding transaction that would comport with state law and allow the swaption to proceed as planned, the Authority requested JPMorgan to provide a liquidity facility for a cost that would fall within the parameters of the 2001 and 2004 Acts. The Authority will also prove that JPMorgan declined to do so. And in fact, due to unprecedented market conditions, the Authority cannot obtain a credit facility from any other source. Therefore, the purpose of the swaption has been frustrated.

Under New York law, performance under a contract is excused where an unanticipated event intervenes to alter "so completely the basis of the contract that . . . without [that basis], the transaction would have made little sense" *Arons v. Charpentier*, 36 A.D.3d 636, 637 (N.Y. App. Div. 2007) (Where a court decision made the recovery of expert fees unattainable, enforcement of the contract became "barred by the doctrine of frustration of purpose") (internal citations omitted); *see also* Restatement (Second) of Contracts § 265 ("Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.").

The Court must assume the truth of the Authority's allegations that it is unable to issue variable rate refunding bonds. Assuming that fact as true, the Authority cannot be held to an agreement whose very purpose – to effect savings as narrowly dictated by statute – has been frustrated.

### 2. The Unforeseeable National Credit Crisis Has Contributed to Frustration of the Purpose of the Swaption

The Authority's inability to arrange for a liquidity facility was caused by the unforeseeable credit meltdown in the United States and elsewhere. "[T]he credit crisis facing the

world's economies in recent months is unprecedented and was not foretold by the world's preeminent economic experts." *Hoosier Energy Rural Elec. Coop. Inc. v. John Hancock Life Ins.*, No. 1:08-cv-1560-DFH-DML, (S.D. Ind. Nov. 25, 2008 *27) (emphasis added) (under New York law, commercial impracticability may bar enforcement of a swap transaction if "the unforeseen event upon which excuse is predicated is due to factors beyond the party's control," and referring to events in the credit market as "this year's credit 'tsunami'"). Impracticability occurs where "after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made . . . ." Restatement (Second) of Contracts § 261. *See also Bush v. Protravel Intern., Inc.*, 746 N.Y.S.2d 790, 797 (N.Y. Civ. Ct. 2002) (internal citations omitted) (finding that the plaintiff raised sufficient material issues of fact concerning her inability to cancel a contract by a specified date).

JPMorgan argues that irrespective of whether "the markets have moved against [it]," the Authority has no right to repudiate the swaption. (Def. Mem. p. 1). If there is merit to that argument, however, including whether the uniquely onerous conditions of the current credit market frustrated the purpose of the swaption (or whether those conditions rise to the level of impossibility or impracticability), its merit certainly cannot be determined on a motion to dismiss. Rather, the Authority's claims – and the merits of the defenses JPMorgan's response suggests it will advance – can be decided only on the basis of a fully developed evidentiary record.

## CONCLUSION

As this Memorandum establishes, the claims asserted in the Authority's complaint present any number of disputed issues of fact and law. Whether the swaption is void or voidable

cannot be determined as a matter of law on a motion to dismiss.  JPMorgan's motion should be denied.

Dated:  December 16, 2008.

Respectfully submitted,

s/ Lee H. Zell
Bar Number:  ASB-5869-L58L
E-mail: lzell@balch.com

Kimberly T. Powell
Bar Number:  ASB-7120-T80K
Email: ktpowell@balch.com

Attorneys for Plaintiff Alabama Public School and College Authority

**OF COUNSEL**:
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 488-5815

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2008, I electronically filed the foregoing via the Court's CM/ECF system, which will electronically send notice to the following counsel of record:

> Don B. Long, Jr.
> Gilbert E. Johnston, Jr.
> Clark R. Hammond
> Alan D. Mathis
> Joseph W. Carlisle
> JOHNSTON BARTON PROCTOR & ROSE LLP
> Colonial Brookwood Center
> 569 Brookwood Village, Suite 901
> Birmingham, Alabama 35209
> Telephone: (205) 458-9400
> Facsimile: (205) 458-9500
>
> Thomas C. Rice
> George P. Choundas
> Ian R. Dattner
> SIMPSON THACHER & BARTLETT LLP
> 425 Lexington Avenue
> New York, New York 10017-3954
> Telephone: (212) 455-2000
> Facsimile: (212) 455-2502

> s/ Lee H. Zell
> Of Counsel