IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA PUBLIC SCHOOL AND COLLEGE AUTHORITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:08-CV-863-WKW[WO] |
| JPMORGAN CHASE BANK, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Fish-and-chips and derivative transactions: Each has been adopted by the United States from its English heritage.[1]  One is more appetizing than the other, but this opinion is not about fish-and-chips.  It is about the Alabama Public School and College Authority's appetite for a bad taste of a derivative transaction.

In this declaratory judgment action, Plaintiff Alabama Public School and College Authority (the "Authority") argues that a swaption transaction entered into between it and Defendant JPMorgan Chase Bank ("JPM") in March 2002, and amended in January 2003, is void or, alternatively, voidable.  Pending is JPM's Motion to Dismiss (Doc. # 6), filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion is

---

[1] Alexander E. Kolar, *Hammersmith Meets Orange County: "Wishing Upon a Star" with Taxpayer Money in the Municipal Bond Derivative Market*, Washington Univ. Journal of Urban & Contemporary Law (Summer 1996).

accompanied by a Memorandum of Law (Doc. # 7).[2]  The Authority filed a Memorandum in Opposition to JPM's Motion to Dismiss (Doc. # 16), to which JPM submitted a Reply (Doc. # 18).  As explained below, the arguments for and against Rule 12(b)(6) dismissal lead to more questions than answers, revealing an abundance of factual and legal chasms and making this action wholly unsuitable for resolution on a motion to dismiss.  The motion to dismiss, therefore, is due to be denied.

## II.  JURISDICTION AND VENUE

Jurisdiction is exercised pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) and 28 U.S.C. § 2201 (Declaratory Judgment Act).  The parties do not contest personal jurisdiction or venue, and the court finds allegations sufficient to support both.

## III.  STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8:  "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (May 19, 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the

---

[2] JPM later substituted a Memorandum of Law (Doc. # 13) for the purpose of correcting the table of contents and the table of authorities in the original Memorandum of Law (Doc. # 7).  Herein, citations to the record are to Document Number 13.  Additionally, for ease of reference, the briefs are referred to only by their assigned docket number.

reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (brackets added; citation omitted).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 556).  Hence, while the complaint need not set out "detailed factual allegations," *Bell Atl. Corp.*, 550 U.S. at 555, it must provide sufficient factual amplification "to raise a right to relief above the speculative level," *id.*

In addition to considering the properly-pleaded allegations of the complaint, the court can consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, ___, 127 S. Ct. 2499, 2509 (2007).  Public records comprise a category of documents subject to judicial notice.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).  Moreover, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal[.]" *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (*per curiam*).  And "the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." *Id.*  The court's "duty to accept the facts in the complaint as true does not require [the court] to ignore specific factual details of the pleading in favor of general or conclusory allegations." *Griffin Indus., Inc. v. Irvin*, 496

F.3d 1189, 1205-06 (11th Cir. 2007).  "Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."  *Id.* at 1206.

## IV.  FACTUAL BACKGROUND[3]

**A.    The Parties**

The Authority is an Alabama public corporation established pursuant to Alabama Code §§ 16-16-1 to 16-16-16.  It is charged with providing for the acquisition, construction, and equipping of public schools and other educational facilities in the State of Alabama. (Compl. ¶ 2); Ala. Code § 16-16-7.  To effect its statutory purposes, the Authority is authorized to issue bonds secured by and payable from certain state taxes required by law to be paid into Alabama's Education Trust Fund.  (Compl. ¶ 2); Ala. Code § 16-16-8.

JPM is a New York banking corporation.[4]  (Compl. ¶ 3.)  It is alleged that JPM "regularly conducts business in Alabama and engaged in activities in this district relating to the interest rate swap transaction that is the subject of this action."  (Compl. ¶ 3.)

---

[3] The following allegations are taken from the Complaint and the documents attached to and/or incorporated by reference in the Complaint.

[4] JPM is a New York corporation with its principal place of business also in New York.  (Compl. ¶ 3.)

4

## B.   **The Swaption**[5]

The Authority filed this declaratory judgment action seeking to void a derivative

transaction known as a "swaption" it entered into with JPM on March 13, 2002 (Compl. ¶ 6),

pertaining to the Authority's outstanding fixed interest rate Series 1998 Bonds ("Series 1998

Bonds") issued in the original principal amount of $300,000,000[6] (Compl. ¶ 2).   JPM

---

[5] A "swaption," as defined by the Authority, "is simply an option to enter into an interest rate swap at a future date[.]"  (Doc. # 16, at 3 n.2.)  The Authority says that "the type of interest rate swap at issue in this case is 'an agreement by which one party agrees to pay the counterparty a fixed rate of interest on a notional amount for a specified period of time.  In return, the courterparty agrees to pay the first party an adjustable rate of interest on the same notional amount for the same period of time.'"  (Doc. # 16, at 3 n.2 (quoting *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1469 (11th Cir. 1992)).)  In *JPMorgan Chase & Co. v. C.I.R.*, 530 F.3d 634 (7th Cir. 2008), a decision involving the taxation of JPM's income from swap transactions, the Seventh Circuit defined a swap in the following helpful manner:

> [Swaps] are essentially contracts between two parties designed to serve as protection against fluctuations embedded in an investment.  These fluctuations can come from a number of sources, such as interest rates, commodities, or currencies.  The two parties to a swap contract agree to exchange payments at specified intervals.  The value inherent in a swap is a function of the difference between the amount of money that one party takes in from and gives out to the other party (i.e., the "counterparty").  To clarify, in the context of an interest rate swap, the magnitude of payments in both directions is determined by multiplying the relevant interest rate by some constant referred to as the "notional amount."  Usually, one party multiplies this notional amount by a fixed interest rate, and the other party multiplies this amount by a floating interest rate (e.g., the London Interbank Offered Rate).  These payments are then exchanged, or swapped, periodically.  If the floating rate is, for instance, below the fixed rate, the party paying out the floating rate takes in money, and the other party loses money on the swap.

*Id.* at 636 (internal footnote omitted).

[6] Henceforth, the court refers to the interest rate swap transaction entered into between the parties on March 13, 2002, and amended on January 16, 2003, as "the Swaption."  The Swaption is governed by the ISDA Master Agreement dated March 13, 2002; the U.S. Municipal Counterparty Schedule to the Master Agreement, dated March 13, 2002; an ISDA Credit Support Annex, dated March 13, 2002; and Confirmations of swap transactions (including the Amended and Restated Confirmation, dated January 16, 2003) (collectively, "Swaption Agreement").  These documents, which are central to the Authority's claims, are attached to the Complaint and, thus, are properly considered on a motion to dismiss.  *See Tellabs*, 127 S. Ct. at 2509.

It is notable also that, although not material to resolution of the motion to dismiss, according to

"marketed the [S]waption" as a transaction that, among other things, would represent "a hedge by which [the Authority] could protect against the risk of future rises in interest rates," and would permit the Authority "to refund and refinance its . . . Series 1998 Bonds by issuing variable rate bonds, the costs of which would not exceed . . . the costs associated with debt service on the Series 1998 Bonds." (Compl. ¶ 7.)

Under the terms of the Swaption, JPM, in exchange for a payment to the Authority of $2.2 million (the "premium" as it is called in the Swaption Agreement, *see* Doc. # 1-2, at 65), "acquired the supposed right to enter into an interest rate swap with [the Authority] on or after November 1, 2008." (Compl. ¶ 7.) The November 1, 2008 date coincided with the first date upon which the Series 1998 Bonds could be redeemed.[7] The Swaption also was based upon an "expectation" by both the Authority and JPM "that if [JPM] exercised its option," the Authority (1) "simultaneously would issue variable rate bonds to refund and refinance its Series 1998 Bonds," (2) "would make periodic fixed rate payments to [JPM]," and (3) "would receive periodic variable rate interest payments, based upon a percentage of the 1-month London Interbank Offered Rate ('LIBOR'), from [JPM]." (Compl. ¶ 7.) The notional principal amount to which the "Fixed Rate Payer Payment" and the "Floating Rate Payer Payment" are tied is equal to the principal amount of the refunding bonds that the

_____

JPM, JPM has entered into "four related swaption transactions" with the Authority. (Doc. # 13, at 1; *see also* Doc. # 16, at 27.) It is the first Swaption that is at issue in this lawsuit.

[7] The Series 1998 Bonds reach final maturity on November 1, 2018, twenty years after the date of their original issuance. (Doc. # 16, at 2.) Under specified conditions, but no earlier than November 1, 2008, the Authority may redeem the Series 1998 Bonds before maturity and refinance them by issuing refunding bonds. (Doc. # 16, at 2.)

Authority expected to issue upon JPM's exercise of the Swaption.  (Swap Transaction Confirmation, dated March 13, 2002, at 2, 3 (Ex. to Compl. (Doc. # 1-2, at 64)).)  The Swaption was amended on January 16, 2003, for the purpose of lowering from 70 percent to 67 percent the percentage of the one-month LIBOR, upon which JPM's floating rate payment would be calculated in the event JPM exercised its option.  In connection with the January 16, 2003 amendment, JPM made an additional "premium" payment to the Authority in the amount of $500,000.  (Compl. ¶ 7; (*see* Doc. # 1-2, at 72).)

**C.**     **The Basis for this Lawsuit**

This dispute arose in June 2008, when JPM notified the Authority that on November 1, 2008, it intended to exercise its Swaption and effectuate the swap transaction.  (Compl. ¶ 11.)  The Authority filed this declaratory judgment action "to determine the rights and obligations of the parties" with respect to this Swaption.  (Compl. ¶ 1.)  More specifically, the Authority asks the court to declare that the Swaption is "void" or "voidable."  (Compl. ¶ 13.)

**1.**     ***The Authority's Allegations that the Swaption is Void***

**a.**     **The Alleged Material Departures**

The Authority alleges that the Swaption is void because, in two ways, it "departed materially from the manner in which a swaption typically operates" (Compl. ¶ 8), and in doing so, violated Alabama law authorizing swaptions.  First, while Alabama law "authorize[s]" the Authority to enter into a swaption for the purpose of "hedg[ing]" against

an interest rate or other similar risk," the Swaption "was not a legitimate hedging transaction within the meaning of Alabama law." (Compl. ¶ 8.)  The combined $2.7 million premium payments made by JPM to the Authority in 2002 and 2003 "were designed to represent savings that [the Authority] would expect to receive upon a later refunding of the Series 1998 Bonds[.]" (Compl. ¶ 8.)  In this "sense," the premium payments "were described by [JPM] as a hedge against a rise in interest rates between 2002 and November 2008, when refunding bonds could be issued." (Compl. ¶ 8.)  The premium payments, however, "represented less than 1% of the outstanding amount of the Series 1998 Bonds." (Compl. ¶ 8.)

Factoring in the anticipated costs of issuing refunding bonds in November 2008, when JPM exercised its Swaption, the Authority "realize[d] virtually no savings in connection with the supposed hedge by the [S]waption." (Compl. ¶ 8.)  "[T]he effect of the [S]waption was that [the Authority] sold to [JPM] its right to potential future benefits that would result from a decline in long-term interest rates in exchange for avoiding the risk of an extraordinary and historically unprecedented increase in long-term rates." (Compl. ¶ 8.)  "That supposed risk was so remote as to have been no risk at all." (Compl. ¶ 8.)

Second, contrary to that which is "commonly specified in legitimate swaption transactions," the "fixed rate payment[s]" set out in the Swaption did not "match the declining balances of an existing fixed rate bond issue." (Compl. ¶ 9.)  Rather, it was, in essence, a "loan" to JPM from the Authority, but the Authority "has no statutory or legal authority to make loans[.]" (Compl. ¶ 9.)  Under a "legitimate" structure, the Authority's

"fixed rate payment obligations would have been spread roughly equally over the ten-year period following [JPM's] exercise of the swaption."  (Compl. ¶ 9.)  Under the terms of the Swaption, however, "the payment schedule called for [JPM] to receive more than 50% of the fixed rate payments due from [the Authority] – over $35 million – within a year after exercising the swaption and more than 95% of such payments – a total of more than $66 million – within two years of exercise."  (Compl. ¶ 9.)  This payment schedule meant that JPM's "exercise of the swaption was for all intents and purposes a certainty, since by doing so it would receive what amounts to a $66 million loan from [the Authority] with effectively no rate of return or implied interest rate."  (Compl. ¶ 9.)

### b.    The Alleged Absence of a Statutorily-Required Certification

The Authority alleges that the Swaption is "void" for an additional reason.  (Compl. ¶ 10.)  It says that it "has located no . . . finding, determination, or certification with respect to" the Swaption, as required by Alabama Code § 41-1-42.  (Compl. ¶ 10.)

### 2.    *The Authority's Allegations that the Swaption is Voidable*

The Authority avers that the Swaption is "voidable" because of the "Authority's inability to issue variable rate refunding bonds, as the parties contemplated," (Compl. ¶ 13), in compliance with the "Act of May 17, 2004, 2004 Ala. Acts 533; 2004 HB 817 (the '2004 Act')" and the "Act of Dec. 28, 2001, 2001 Ala. Acts 1107; 2001 HB 66 (the '2001 Act')" (Compl. ¶ 11).  "Central to the parties' performance under the [S]waption . . . was their mutual assumption that [the Authority] in fact could issue variable rate refunding bonds in

9

compliance with Alabama law if [JPM] exercised the [S]waption." (Compl. ¶ 11; *see also* Compl. ¶ 11 (alleging that in June 2008, JPM notified the Authority that it intended to exercise the Swaption as of November 1, 2008, and that it "consequently expected [the Authority] on that date to issue variable rate refunding bonds for which [JPM] would provide a variable to fixed rate swap").)

Compliance with the 2001 Act and the 2004 Act, however, is not possible because the "'aggregate annual payment obligations' to which both [Acts] refer include liquidity and support costs associated with [the Authority's] ability to issue and, if necessary, to remarket its bonds." (Compl. ¶ 11.) "Those costs, coupled with the previously described fixed rate payments due to [JPM] under the [S]waption, will substantially exceed, as of November 1, 2008, the aggregate amount payable on the Series 1998 Bonds that would be refunded by virtue of [JPM's] exercise of the [S]waption." (Compl. ¶ 11.) JPM "was aware of that fact, and of the parties' erroneous factual assumption that [the Authority] could comply with the provisions of Alabama law, when [JPM] notified [the Authority] in June 2008 that it intended to exercise the [S]waption." (Compl. ¶ 11.)

### 3.    *The Relief Requested*

Based on the foregoing allegations, the Authority requests that the court enter an order (1) declaring that the Swaption is void and of no force or effect, (2) declaring that the Swaption is voidable by the Authority, (3) rescinding the Swaption, conditioned upon the

repayment of amounts previously paid by JPM, and (4) awarding the Authority such other relief as the court deems appropriate.  (Compl. 7.)

## V.  DISCUSSION

The Authority alleges that the Swaption is void.  It says that it did not have the authority to enter into the Swaption because the Swaption was not a lawful transaction (*e.g.*, was not entered into for the purpose of hedging as required by Alabama law), and did not contain the statutorily-required certification.  Alternatively, the Authority alleges that the Swaption is voidable because of the Authority's alleged inability under Alabama law to issue refunding bonds on November 1, 2008, when JPM exercised the Swaption.  Moving for dismissal, JPM advances several arguments why it contends that "[t]hese claims are without merit" (Doc. # 13, at 1), and in its response (Doc. # 16), the Authority counters those arguments.  The court addresses the arguments in turn.

## A.    **Claims Asserting that the Swaption is Void**

JPM contends that the governing Swaption Agreement defeats the Authority's claim that the Swaption is void.  (Doc. # 13, at 6.)  Namely, JPM says that it is entitled to rely on certain representations in the Swaption Agreement and that based upon those representations, whether or not the Swaption "was actually a hedge [and] properly authorized" by statute, the Authority cannot "now be heard to contest its representations in the Swaption Agreement that the . . . Swaption was a properly authorized, binding, and enforceable transaction."  (Doc. # 13, at 6.)

11

### 1.   The Authority's Alleged Failure to Locate the Statutorily-Required Certification

It is undisputed that the Authority has express statutory power to enter into swap transactions.  (*See* Compl. ¶ 8 (admitting that the Authority "is authorized to enter into a swaption transaction" where "the purpose of the transaction is to hedge against an interest rate or other similar risk").)  That statutory power is grounded in the Alabama Code.  *See* Ala. Code §§ 41-1-40 to 41-1-44.[8]  Section 41-1-40 of the Alabama Code provides, in pertinent part:

> The Legislature finds and declares that the making and managing of investments or the borrowing of money by governmental entities involves a variety of interest rate, investment, payment, and similar risks.  A number of financial instruments are available to hedge against those risks.  Many governmental entities lack express statutory authority to take advantage of those instruments, and it is desirable that they have the authority.

Ala. Code § 41-1-40.[9]

_____

[8] These statutory sections are codified in Article 3 (titled "Swap Agreements") of Chapter 1 of Title 41, and Article 3 is to "be liberally construed to effect its purpose," Ala. Code § 41-1-44.

[9] Section 41-1-41 is the definitions section.  It provides:

In this article, the following terms shall have the following respective meanings:

(1) Counterparty.  The provider of the interest rate floor, cap or collar, or the other party to the swap agreement.

(2) Governmental entity.  The state (or equivalent thereof) or any political subdivision thereof, or any department, agency, board, commission, or authority of the state, or any such political subdivision, or any public corporation, authority, agency, board, commission, state colleges, or universities, or other governmental entity controlled by the state or any such political subdivisions.  This definition shall be inclusive of both the singular and plural form of this term.

Section 41-1-42, in turn, sets out the parameters of a governmental entity's authority to enter into a swap agreement.  At issue is § 41-1-42(2) and the concluding paragraph of this section.  Section 41-1-42(2) provides in pertinent part:

> No governmental entity shall enter into any swap agreement unless . . . :
> a.  The governmental entity's governing body first finds and determines, and certifies to the counterparty, that the swap agreement is entered into for the purpose of hedging against an interest rate, investment, payment, or other similar risk that arises in connection with or incidental to the proper activities of the governmental entity.

Ala. Code § 41-1-42(2).  Section 41-1-42(2) concludes with the following:

> A counterparty that enters into any swap agreement with a governmental entity may rely on a certification by the governmental entity that the factual matters relating to the governmental entity, and other matters in the certification, are correct. Any inaccuracy of the governmental entity's certification shall not affect the enforceability of the swap agreement.

Ala. Code § 41-1-42(2).[10]

---

(3) Swap agreement.  An agreement (including terms and conditions incorporated by reference therein) in the initial notional amount of $5,000,000.00 or more (which notional amount may reduce periodically under the agreement), commonly known as the following:

  a.  An interest rate swap agreement, an interest rate cap agreement, an interest rate floor agreement, an interest rate collar agreement, or any other similar agreement, including any option to enter into any of the foregoing.

  b.  Any combination of any of the foregoing.

  c.  A master agreement for any of the foregoing, together with all supplements.

[10] Here, the governmental entity is the Authority; the Authority's governing body comprises the Governor, the State Superintendent of Education, and the Director of Finance, *see* Ala. Code § 16-16-3; (Doc. # 16, at 12 n.9); and JPM is the counterparty.

13

####     a.       The Arguments

The Complaint alleges that the Authority has not "located" the requisite "finding, determination or certification."  (Compl. ¶ 10.)  JPM, however contends that specific language in three different provisions of the documents comprising the Swaption Agreement, which are appended to the Complaint, satisfy § 41-1-42(2)'s certification requirement. (Doc. # 13, at 7.)  In sum and substance, in the Swaption Agreement, the Authority represents that (1) it had "the power . . . to perform" its contractual obligations and had "taken all necessary action and made all necessary determinations and findings to authorize such execution, delivery and performance"[11]; (2) that its obligations under the Swaption Agreement were "legal, valid and binding . . . [and] enforceable in accordance with their respective terms"[12]; and (3) that the Swaption Agreement and transactions authorized under it would "be . . . entered into for purposes of managing of [the Authority's] borrowing or investments or in connection with a line of business and not for the purpose of speculation."[13]

Additionally, JPM points out that, as part of the Swaption Agreement, the Authority delivered to JPM an opinion from the Authority's counsel, Maynard Cooper (the "Maynard Cooper Opinion"), dated March 13, 2002.  (Doc. # 13, at 8 (citing Ex. 4 to Long Decl.); *see also* U.S. Municipal Counterparty Schedule, Part III, Agreement to Deliver Documents (Doc.

---

[11] (U.S. Municipal Counterparty Schedule, Part 5(g)(ii).)

[12] (Master Agreement § 3(a)(v).)

[13] (U.S. Municipal Counterparty Schedule, Part 5(g)(iv)(k).)

14

# 1-2, at 24).)   The Maynard Cooper Opinion represents, among other things, that "[t]he Authority has the requisite power and authority to enter into the Agreement and to perform its obligations thereunder, and the Agreement has been duly authorized, executed and delivered by the Authority."   (Maynard Cooper Op. ¶ 2; *see also* Maynard Cooper Op. ¶¶ 5-6.)   In light of the foregoing representations made by the Authority in the Swaption Agreement and the Maynard Cooper Opinion, JPM contends that the Complaint's allegation that the Authority has not "located" the requisite "finding, determination, or certification" (Compl. ¶ 10) is insufficient to defeat JPM's motion to dismiss.

The Authority, however, contends that the "various assurances" in the Swaption Agreement upon which JPM relies cannot "be cobbled together as a matter of law to substitute for the actual finding, determination, and certification," required by Alabama Code § 41-1-42(2).  (Doc. # 16, at 16.)  The Authority has submitted what it says is a compliant certification from an unrelated transaction, and asks the court to take judicial notice of it as a public record.  (Powell Decl., Ex. B (Doc. # 17).)  That document, titled "Certificate of the State of Alabama" and signed by the Governor, was issued in connection with a derivative transaction entered into by the State of Alabama in 2004 and, among other things, provides

that the certificate is being provided "as required by Section 41-1-42(2)" of the Alabama Code.[14] (Powell Decl., Ex. B.)

> **b.    Analysis**

As framed by JPM's motion, the issue is whether the Swaption Agreement's representations – that the Authority "ha[d] taken all necessary action," had made "all necessary determinations and findings," had undertaken "obligations" that were "legal, valid, and binding[]," and had entered into the Swaption "not for the purpose of speculation" – constitute a certification within the meaning of § 41-1-42(2).   JPM contends that the answer is "Yes" and that, therefore, the Authority cannot state a plausible claim for relief on the Complaint's assertion that § 41-1-42(2)'s certification has not been "located" (Compl. ¶ 10).

Without explanation, the parties' briefs have sidestepped a seemingly significant threshold factual issue.   The Authority has alleged that it has not "located" the requisite "finding, determination, or certification." (Compl. ¶ 10.)   That allegation begs the question of why the Authority has been unable to locate what it contends is the required documentation.   Is the finding, determination or certification lost or destroyed, or was there never a finding, determination or certification in the first place?   In the corporate and tax law context, for example, a lost, destroyed or stolen certificate or record has a legal consequence

---

[14] The Authority has not articulated a position that a freestanding certification, mirroring the one submitted, is the only manner in which a governmental entity can be found in compliance with § 41-1-42's certification requirement, or whether it believes that there are other permissible parameters for a statutorily-compliant certification. As explained *infra*, it is not necessary today to resolve what form, if any, a finding and determination, and certification must take.  It is merely noted that the Authority's stance on this issue is ambivalent.

and a remedy.  *See*, *e.g.*, *Wilkerson v. Moore*, 318 So. 2d 241, 243-44 (Ala. 1975) (discussing remedy for lost, stolen or destroyed tax records and explaining that "[w]hen records become material in the determination of rights between parties, and those records are shown to have existed, and to have been afterwards lost or destroyed, their contents, like those of documentary evidence[,] may be shown by testimony in its nature secondary" (brackets added)); N.Y. U.C.C. § 8-405 (replacement of lost, destroyed, or wrongfully taken security certificate).   On the other hand, the complete absence of a finding, determination and certification leads to at least two inferences: first, that a finding, determination and certification were made, but were not properly recorded and reduced to a written form; or second, that there never was a finding, determination or certification and, hence, nothing of which to make a record.  Each of these scenarios – (1) a lost or destroyed certification, (2) a failure to properly record a certification, or (3) no certification at all – would be analyzed differently and, arguably, could result in three different legal outcomes.  This factual issue, development of which has been avoided by both parties, has potentially serious legal implications that should not at this early stage be bypassed in favor of an outcome based only upon sketchy facts.[15]

It has not been overlooked that JPM presses for a different legal conclusion, *i.e.*, that the Authority's representations in the scattered documents comprising the Swaption Agreement provide a sufficient basis upon which to conclude that there is compliance with

---

[15] Notably, although central to the Authority's claims, the official transcript documenting the Swaption Agreement has not been submitted by either party.

17

the statutorily-mandated finding and determination, and certification.  The court, however, deems it imprudent to delve into an area of law, which at best appears to be unsettled,[16] at the factually-confined motion to dismiss stage.  This is so particularly when the universe of facts includes only (1) the Complaint's negative representation of fact, *i.e.*, that the Authority "has located no . . . finding, determination, or certification" (Compl. ¶ 10); (2) a negative deduction relied upon by JPM that the Authority, by representing that the Swaption was "not undertaken for speculation," "effectively represented that [the Swaption was] undertaken for hedging" (Doc. # 13, at 7 n.5); and (3) the scattered representations in the Swaption Agreement concerning the Authority's power to enter into and perform its obligations under the Swaption.  Based upon these meager facts and the unanswered questions shrouding the reasons the Authority cannot locate a finding and determination, and a certification, the court finds that a more complete evidentiary record would provide a better backdrop for deciding the issue of whether the Authority complied with § 41-1-42(2).  Accordingly, the Authority's claim survives JPM's motion to dismiss.

## 2.    *The Allegations that the Swaption Was Not a Lawful Transaction*

The Complaint details the respects in which the Swaption allegedly materially departed from conventional and commonly understood interest rate swaptions, and the

---

[16] JPM cites several reported cases where Alabama courts have addressed the requirement of a certification (Doc. # 18, at 6), but not a certification under § 41-1-42(2), and the Authority has offered case law in support of its contrary position (Doc. # 16, at 17).  No authority, however, has been cited by the parties from an Alabama court, or any other court, that interprets the certification requirement in § 41-1-42(2).  To the extent that this action presents an issue of first impression under state law, the court is reluctant to summarily dismiss it at the motion to dismiss stage where the facts are not fully developed.

Authority says that at the "heart" of these allegations is that the Swaption is not authorized because "despite its label," it "was not undertaken 'for the purpose of hedging against an interest rate, investment, payment, or other similar risk . . . aris[ing] in connection with or incidental to [its] proper activities.'"  (Doc. # 16, at 20 (quoting § 41-1-42).)  According to the Authority, the $2.7 million up-front premium payments it received from JPM were supposed to be "a hedge against a rise in interest rates between 2002 and November 2008" when the Series 1998 Bonds could be refunded and refinanced (Compl. ¶ 8), but those premium payments "provided no hedge" (Doc. # 16, at 20).  The Authority also says that the Swaption, with its front-end loaded payments, "effectively was nothing more than a huge loan to [JPM] with effectively no rate of return[.]"  (Doc. # 16, at 20; *see also* Compl. ¶¶ 8-9.)  And, the Authority "has no statutory or other legal authority to make loans[.]" (Compl. ¶ 9.)

No doubt trying to avoid (as both parties do, for different reasons) an admission that the Authority entered into an incredibly risky and bad derivative deal, the Authority takes the position that based upon these material departures, the Swaption exceeded the express terms of the authorizing statute, and that consequently the Swaption is void (Compl. ¶¶ 8-9).  It asserts also that its lack of authority to enter into the Swaption in the first place is an issue separate from whether the Swaption is supported by the statutorily-required certification (Compl. ¶ 10).  (Doc. # 16, at 20.)

There is no dispute in this litigation that swap agreements are complicated financial transactions. Indeed, as recognized by JPM (Doc. # 13 at 1 n.1), substantial time and effort were invested by the Authority in its initial evaluation phase as to the feasibility, risks and benefits of swaptions: (1) Requests for proposals were sought from various financial institutions for the terms on which those institutions would be willing to offer the contemplated swaptions; (2) legislation in Alabama had to be passed to facilitate the swaptions; (3) a "leading swap advisory group" was consulted; and (4) outside counsel for the Authority was retained. (Doc. # 13, at 1 n.1.) With that recognition, it becomes clear that the issue of the Authority's authority to enter into the Swaption implicates questions of fact, some mixed with questions of law and  some of which may require the aid of expert testimony and, which left unanswered, advise against dismissal of the Complaint.

Two initial issues concern the interplay between the 2001 Act and the 2004 Act (Compl. ¶ 11) and the bearing, if any, that either or both of these Acts have on the Authority's authority to agree to the Swaption's terms. At this point, it is helpful to set forth the text of those acts. The 2001 Act provides:

> Notwithstanding any other provision of law, the Authority shall have the power to issue refunding obligations to refund the Authority's Refunded Bonds without regard to any statutory debt service savings requirement if, and only if, at or prior to the time at which the Authority issues such refunding obligations, the Authority shall have entered into one or more swap agreements, as defined in Section 41-1-41, pursuant to which the Authority shall have *fixed* its *aggregate annual payment obligation* (taking into account payments under such swap agreements combined with payments on the refunding obligations) *in an amount not exceeding* the aggregate annual amount payable on the Refunded Bonds.

Act of Dec. 28, 2001, No. 2001-1107, § 2, 2001 Ala. Acts 1107 (emphasis added); *see also id.* § 1(3) (providing that "Refunded Bonds" include the Authority's Series 1998 Bonds). The 2004 Act differs, but substantively for present purposes only in the wording of the last clause.

> Notwithstanding any other provision of law, the State, acting by and through the Commission, and each Authority, shall have the power to issue refunding obligations to refund their Refunded Bonds without regard to any statutory debt service savings requirement if, and only if, at or prior to the time at which the Authority . . . issues such refunding obligations, the Authority . . . shall have entered into one or more swap agreements, as defined in Section 41-1-41, pursuant to which the Authority . . . shall have determined its *aggregate annual payment obligation* (taking into account payments under such swap agreements combined with payments on the refunding obligations) *in an amount not expected to exceed* the aggregate annual amount payable on the Refunded Bonds.

Act of May 17, 2004, No. 2004-533, § 3, 2004 Ala. Acts 533 (emphasis added).

JPM has noted that "specific legislation" was "sought and obtained" to "facilitate" the Swaption (Doc. # 13, at 1 n.1) entered into between JPM and the Authority in March 2002. It appears to be agreed that the 2001 Act, enacted "less than three months" (Compl. ¶ 11) prior to the execution of the Swaption Agreement, is part of that legislation. (*See, e.g.*, Doc. # 16, at 7 ("The [S]waption . . . owes its existence to the 2001 Act[.]").) Indeed, it is

expressly alleged that the 2001 Act "was intended to apply specifically to the [S]waption[.]"[17] (Compl. ¶ 11.)

The 2001 Act, which pertains specifically to the Authority, authorizes a singular transaction in relation to its Series 1998 Bonds, and that singular transaction is a refunding of the Series 1998 Bonds. However, by the specific terms of the 2001 Act, the refunding cannot occur (at least without regard to any statutory debt service savings requirement) without a swaption being in place.

Here, there is compliance with the 2001 Act to the extent that in November 2008, when the issuance of refunding obligations was to be sought, there was a Swaption already in place. There remains a question, however, whether the Authority "fixed" its obligations in an amount not exceeding the refunded bond payments and, thus, complied with the 2001 Act.[18] Under the 2001 Act, the time at which the Authority "shall have fixed its aggregate annual payment obligation" is at the time of the execution of the Swaption Agreement, *i.e.*, in 2002, not at the time of issuance of the resulting refunding bonds. It is true that the

---

[17] Notwithstanding the allegation that the 2001 Act "was intended to apply specifically to the [S]waption" (Compl. ¶ 11), and JPM's apparent recognition of that relationship, JPM essentially asks the court to put on blinders and to find, based solely upon the Swaption Agreement's terms, that the Swaption did not require the Authority to refund its Series 1998 Bonds. JPM, however, has not explained how the 2001 Act can be completely divorced from the Swaption Agreement and the Swaption itself. This, at the very least, leaves yet another question unanswered, further confirming that the issues raised in the motion to dismiss are not amenable to resolution at this juncture. The Swaption Agreement's terms are discussed later in this opinion in the section addressing the arguments for and against a finding that refunding was a condition precedent to the Authority's performance under the Swaption, once exercised by JPM.

[18] Whether the question is one of law or one of fact, as explained, the court does not believe that a matter of such importance should be decided on the present record on a motion to dismiss.

Authority "fixed" its payments in the Swaption Agreement (*see* Annex II appended to the March 2002 Swap Transaction Confirmation (Doc. # 1-2, at 72)); however, whether those payments would exceed the aggregate annual amount payable on the refunded bonds could only be determined at the time the Swaption went into effect, which was in November 2008. That is because the refunded bonds the Authority was to obtain were based upon variable rates, which would have been unknown in 2002 when the Swaption Agreement was executed.  It has not been answered by JPM, whether at the time the Swaption Agreement was executed, it was possible for the Authority to have "fixed its aggregate annual payment obligation . . . in an amount not exceeding the aggregate annual amount payable on the Refunded Bonds," as required under the 2001 Act.  And if, as JPM contends, refunding the Series 1998 Bonds was not an agreed-upon Swaption term, *see supra* note 17, on the Rule 12(b)(6) facts, there would appear to be, at the very least, an unresolved issue as to whether the Authority agreed to a Swaption for a purpose not authorized by the 2001 Act.[19]

It may be, as JPM points out (Doc. # 18, at 22), that the 2004 Act cured the problem by changing the equation from a calculation of certainty ("fixed") to a calculation of

---

[19] Any action of the Authority outside the specific authorization of the 2001 Act arguably is *ultra vires* and relatedly, any contract entered into for a purpose not authorized by the 2001 Act arguably is void.  *See City of Tuskegee v. Sharpe*, 288 So. 2d 122, 124 (Ala. 1973) ("This court has always strongly maintained the doctrine, both as to private and municipal corporations, that contracts made by or with them, outside the pale of their corporate authority, confer no right, and that neither the making of an ultra vires contract nor the receiving of its benefits estops the corporation from setting up its invalidity." (quoting *Cleveland Sch. Furniture Co. v. City of Greenville*, 41 So. 862, 864 (Ala. 1906))); *Paterson & Edey Lumber Co. v. Bank of Mobile*, 84 So. 721, 722-23 (Ala. 1919) ("'A contract of a corporation which is ultra vires, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature, is not voidable only, but wholly void, and of no legal effect.'" (quoting *Concord First Nat'l Bank v. Hawkins*, 174 U.S. 364, 370 (1899))).

probability ("not expected to exceed").  *Compare* the 2001 Act (*i.e.*, "The Authority *shall have fixed* its aggregate annual payment obligation . . . in an amount *not exceeding* the aggregate annual amount payable on the Refunded bonds."), with the 2004 Act (*i.e.*, "[T]he Authority . . . *shall have determined* its aggregate annual payment obligation . . . in an amount *not expected to exceed* the aggregate annual amount payable on the Refunded Bonds.").  The crimp here, however, is that the execution of and amendment to the Swaption Agreement predates the 2004 Act; the Swaption Agreement, executed in 2002 and amended in 2003, was put in place under the more rigorous strictures of the 2001 Act.  JPM has not demonstrated how the 2004 Act – that creates an entirely different standard requiring discernment of the Authority's expectations of performance[20] – can alter a contract (*i.e.*, the Swaption Agreement) already in place under the 2001 Act.[21]

These observations lead to yet another question which is unanswered by the briefs. How can a contractual transaction (*i.e.*, the Swaption Agreement) be complete in its terms, as claimed by JPM (*see*, *e.g.*, Doc. # 13, at 11-13), when the very Act (*i.e.*, the 2001 Act) that

---

[20] Notably, there is no allegation in the Complaint that the 2004 Act's requirement was contemplated by the Authority when the Swaption Agreement was executed.

[21] In its reply brief, JPM says for the first time, but without sufficient answers to the nagging questions, that the 2004 Act's requirement as to the Authority's expectation as to its payment obligation on future refunding bonds applies retroactively.  (Doc. # 18, at 22.)  Because of the complexities of this litigation and because the Authority has not been given an opportunity to respond, the court will not address JPM's argument introduced in a reply brief.  *Cf. United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984) (*per curiam*) (refusing to consider a new legal argument raised for the first time in a reply brief at appellate level).

allegedly "was intended to apply specifically to the [S]waption" (Compl. ¶ 11) imposes a condition that seemingly cannot be met under any scenario?

In addition to the questions arising from application of the 2001 Act and the 2004 Act to the Swaption, other questions include, but are not limited to: (1) Is the Swaption payment schedule (*see* Annex II appended to the March 2002 Swap Transaction Confirmation (Doc. # 1-2, at 72)), requiring the Authority to pay more than $35 million to JPM in the first year, which equates to more than 50 percent of the total payments due over the life of the payment schedule (Compl. ¶ 9), typical in interest rate swap agreements?  (2) Does the front-loaded payment structure render the Swaption illegal?  (3) Is there such a thing as a "standard" swaption; if so, what are its components, and did the Swaption at issue depart materially from those standards?  (4) Is the Swaption an "interest rate swap agreement" at all, as contemplated by the Legislature, taking the term "interest rate swap agreement" at its § 41-1-41 or common meaning?  (5) Is the Authority's fixed-rate payment tied to an interest rate, and if not, does that affect the legality of the supposed "interest rate swap"?  (6) What is the industry definition of a "physical settlement" swap, given the parties' disagreement as to its meaning, and how is that definition applied in light of prevailing industry practices? (*Compare* the Authority's definition (Doc. # 16, at 8 (arguing that in this case a "physical settle swaption" means that the "interest rate swap actually [was] put in place on an underlying obligation (here the variable rate refunding bonds to be issued by the Authority) if the [S]waption [was] exercised")), with JPM's contrasting position (Doc. # 18, at 13 n.14

(asserting that industry definition of a "physical settlement" swaption "is merely a swaption wherein, upon exercise, specified payments are exchanged over time according to an agreed schedule")).)  (7) Why should it be assumed, as JPM urges, that if the Swaption Agreement was "not for the purpose of speculation" (U.S. Municipal Counterparty Schedule, Part 5(g)(iv)(k)), it decidedly was entered into for purposes of hedging?

The court does not pretend to know the answers to all of these issues, whether ultimately all of these issues will be material to resolution of this case, or whether resolution of these issues will lie in favor of JPM or the Authority.  By the foregoing discussion, the court merely confirms that the issues are multifaceted and complex, and that on the arguments and facts presented, there are too many missing facts and unresolved questions to grant a motion to dismiss.  Hence, the court finds that this action is not amenable to resolution on a motion to dismiss on the question of whether the Swaption was a lawful transaction (*see* Compl. ¶¶ 8-9).  The claim, therefore, will go forward, and the motion to dismiss will be denied.

### 3.    *Estoppel*

"[T]he purpose of the doctrine of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience."  *Robinson v. Boohaker, Schillaci & Co., P.C.*, 767 So. 2d 1092, 1094 (Ala.

2000).[22]  JPM presents two equitable estoppel theories in support of its argument that the Authority "cannot repudiate" the representations it made in the Swaption Agreement concerning its valid and binding obligations.  (Doc. # 13, at 9.)  First, JPM relies upon the language in the closing paragraph of § 41-1-42(2) that "[a]ny inaccuracy of the governmental entity's certification shall not affect the enforceability of the swap agreement."  Ala. Code § 41-1-42(2).  As urged by JPM, this statutory provision precludes the Authority from arguing that its representations in the Swaption Agreement were incorrect, thereby rendering the Swaption enforceable.

Second, JPM relies upon general common-law estoppel principles, asserting that the Authority "is conclusively bound by its representations."  (Doc. # 13, at 10.)  In support of this argument, JPM relies on two decisions, *Town of Brewton v. Spira*, 17 So. 606, 607-08 (Ala. 1895) (holding that a recital in a municipal bond issued for electrical lights mistakenly providing that the bonds were "'issued by virtue of an ordinance . . . , under authority of and in accordance with the provisions of an act of the Legislature of Alabama . . . authorizing the said city of Brewton to issue bonds'" estopped the municipality from asserting that the bonds were issued for an unlawful purpose), and *Brown-Crummer Inv. Co. of Wichita, Kan., v. City of Florala, Ala.*, ("*Brown-Crummer*"), 55 F.2d 238, 242 (M.D. Ala. 1931) (applying *Spira* and holding that, where the municipality represented and delivered an opinion of counsel to

---

[22] The parties have relied upon Alabama law in support of their arguments for and against estoppel; hence, the court also has relied upon Alabama law.  *See* U.S. Municipal Counterparty Schedule, and *infra* note 26.

buyer that bonds were valid and duly authorized, the municipality was estopped from later contesting validity of bonds based upon purported lack of authority to issue them).  JPM cites these decisions as standing for the "general principle[]" that "a public entity cannot assert that a contract into which it has entered is unauthorized when it has previously represented that it is authorized to enter into the agreement."  (Doc. # 13, at 9.)

The Authority counters that it "appropriately seeks to rescind a transaction that it had no authority to enter into in the first place," both because, despite its label, the Swaption essentially was a loan which the Authority had "no statutory or other legal authority to make" (Compl. ¶ 9), and because of the Swaption Agreement's "apparent[]" failure to be "documented in accordance with" § 41-1-42(2) (Compl. ¶ 10), and that this alleged absence of authority means that it "cannot be estopped."  (Doc. # 16, at 18.)  The Authority says that "the doctrine of estoppel is unavailable to validate a transaction that fails to comply with statutory requirements[.]"  (Doc. # 16, at 18.)  It principally relies upon *Perkins v. Shelby County*, 985 So. 2d 952 (Ala. Civ. App. 2007).  (Doc. # 16, at 18); *see Perkins*,  985 So. 2d at 956 ("[A] . . . municipality cannot be estopped . . . [when it] 'question[s] the legality of a contract into which it had no authority to enter'" or when it "seeks to avoid doing 'that which it has no authority to do,'" *id.* at 956-57 (quoting *Talladega City Bd. of Educ. v. Yancy*, 682 So. 2d 33 (Ala. 1996)), and noting a distinction between a municipality's lack of authority to enter into a contract, to which estoppel cannot be applied,  *id.* at 956, and a municipality's

28

"mere[] fail[ure] to follow the formalities of contract execution," to which estoppel can be applied, *id.* at 957.).

There are several problems with JPM's reliance on estoppel at the present juncture. First, estoppel is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), and the general rule is that "the existence of an affirmative defense will not support a motion to dismiss," *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984), *en banc reh'g*, 764 F.2d 1400, 1400 (11th Cir. 1985) (*per curiam*) (reinstating panel opinion)[23]; *see also La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) ("[P]laintiffs [are] not required to negate an affirmative defense in [their] complaint." (citation omitted)).  Notably, neither *Spira* nor *Brown-Crummer*, relied upon by JPM, was decided on a motion to dismiss, but rather on an evidentiary record.  *See Spira*, 17 So. at 608; *Brown-Crummer*, 55 F.2d at 238.

Second, as discussed in the preceding subsection, whether the Authority was authorized by Alabama law to enter into the Swaption requires further factual and legal development; hence, whether the Authority lacked "authority," within the meaning of *Perkins*, 985 So. 2d at 956, or for another reason, is not readily determinable on the Rule 12(b)(6) incomplete factual record.

Third, and relatedly, the arguments for and against estoppel also are inextricably intertwined with the issue of whether the Swaption is supported by a certification, compliant

---

[23] *Quiller* was relied upon for these principles in a recent Eleventh Circuit opinion, *albeit* an unpublished one.  *See Brown v. One Beacon Ins. Co.*, No. 08-14775, 2009 WL 366801, at *1 (11th Cir. Feb. 17, 2009).

with § 41-1-42(2) of the Alabama Code, as discussed in Section V.A.1.  Postponement of resolution of the certification issue pending further factual development cautions against resolution of whether principles of estoppel can be applied.  Based upon the present state of the record, the court cannot say that it is apparent "on the face of the [C]omplaint" that the Authority is estopped from denying the validity of the Swaption.  *Quiller*, 727 F.2d at 1069; *see also Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008) ("A complaint is subject to dismissal for failure to state a claim 'when its allegations, on their face, show that an affirmative defense bars recovery on the claim.'" (citation omitted)).

Fourth, the Authority says that JPM is not an innocent party, as was the bond purchaser in *Spira*, *see* 17 So. at 607.  (Doc. # 16, at 19.)  According to the Authority, JPM is not free from blame for the Authority's present plight because JPM "proposed, structured, and engineered the [S]waption with knowledge on both the limitations on the Authority's power and the conditions the Authority was required to satisfy in order to exercise that power."  (Doc. # 16, at 19.)  The doctrine of estoppel "is equitable in nature," *Dillman v. Combustion Eng'g, Inc.*, 784 F.2d 57, 60 (2d Cir. 1986), which brings into play the maxim that one "'who seeks equity must do equity,'" *Cable Holdings of Ga., Inc. v. McNeil Real Estate Fund VI, Ltd.*, 988 F.2d 1071, 1077 (11th Cir. 1993) (Tjoflat, Chief J., dissenting) (citation omitted); *see also Robinson*, 767 So. 2d at 1094 ("The party asserting the doctrine of equitable estoppel may not predicate his claim on his own dereliction of duty or wrongful conduct." (internal quotation marks and citation omitted)).  On the question of JPM's blame,

if any, whether equitable estoppel is a valid defense requires an analysis of several factual issues, including among others the extent, if any, of JPM's involvement in the structuring of the Swaption, and the scope of JPM's knowledge pertaining to the validity of the Swaption under governing Alabama law.  These fact-intensive issues are not answered by the Complaint and its attachments.

In sum, a ruling as to whether the Authority is equitably estopped from denying the validity of the Swaption or whether JPM is not entitled to rely on the affirmative defense given its alleged wrongful conduct would not be appropriate since there is not a factual record upon which the ruling can be made.  The motion to dismiss on estoppel grounds will be denied.

**B.    Claims Asserting that the Swaption is Voidable**

JPM also contends that the Authority's claims that the Swaption is voidable are subject to Rule 12(b)(6) dismissal.  JPM argues that the allegation that the Authority's performance under the Swaption Agreement was conditioned upon the Authority's ability to issue refunding bonds fails because: (1) the Swaption Agreement does not require that the Authority be able to issue new bonds as a condition to its performance; and (2) the Authority has failed to plead facts that, if proven, would demonstrate an inability to issue refunding

bonds under the 2001 Act and the 2004 Act.[24]  Accordingly, JPM argues that the Authority

"has no basis to evade its contractual obligations."  (Doc. # 13, at 1.)

*1.*     ***Whether the Authority's Ability to Obtain Refunding Bonds Is a Condition***

***Precedent to the Performance of the Swaption***

The Complaint alleges that the Swaption is "voidable" because of the "Authority's

inability to issue variable rate refunding bonds, as the parties contemplated, in compliance

with the 2001 Act (as amended by the 2004 Act)."  (Compl. ¶ 13; *see also* Compl. ¶ 11

("Central to the parties' performance under the [S]waption . . . was their mutual assumption

that [the Authority] in fact could issue variable rate refunding bonds in compliance with

Alabama law if [JPM] exercised the [S]waption.").)  In the Complaint, the Authority has

alleged that it was "anticipated by the parties" (Compl. ¶ 1), and it further was their

"expectation" (Compl. ¶ 7) and "assumption" (Compl. ¶ 11), that a stipulation to the exercise

of JPM's swaption was the Authority's ability to refund and refinance its fixed rate Series

1998 Bonds by issuing variable rate refunding bonds (Compl. ¶ 7).  That expectation

allegedly resulted, in part, from pre-contractual representations made by JPM during its

marketing presentation to the Authority.  (Compl. ¶ 7.)  JPM repeated those representations

to the Authority in 2002 when the Swaption was executed and again in 2003 when the

Swaption was amended.  Namely, in 2002 and 2003, JPM "described" the payments it made

_____

[24] JPM also argues that the Authority has not alleged (and cannot allege) facts that would excuse it from performing the Swaption pursuant to the doctrine of mutual mistake.  (Doc. # 13, at 13-16.) Because the Authority disavows reliance on the doctrine of mutual mistake (Doc. # 16, at 25 n.23), it is unnecessary to address this issue.

to the Authority "as a hedge against a rise in interest rates between 2002 and November 2008, when refunding bonds could be issued." (Compl. ¶ 4.) Further, it is alleged that when JPM notified the Authority of its decision to exercise the Swaption on November 1, 2008, it "consequently expected the Authority on that date to issue variable rate refunding bonds for which [JPM] would provide a variable to fixed rate swap." (Compl. ¶ 11.)

### a.   The Arguments

JPM contends that the foregoing allegations fail to state a claim because there is no provision in the Swaption Agreement that requires the Authority's issuance of variable rate refunding bonds upon JPM's exercise of the Swaption. JPM contends that the allegations in the Complaint, phrased as an "expectation" and "assumption," amount to a tacit concession by the Authority that the Swaption Agreement does not require the Authority to issue refunding bonds.[25] (Doc. # 13, at 13.) According to JPM, the fact that the Swaption Agreement "unequivocally enumerates the conditions to [the Authority's] performance of its obligations under the First Swaption," with no mention that the Authority's "ability to issue bonds is . . . one of the conditions[,] is fatal to [the Authority's] voidability claim." (Doc. # 18, at 13.) In the latter regard, JPM argues that the Swaption Agreement required only that the Authority make "specified payments" and "whether [the Authority] additionally

---

[25] It should be pointed out that, at the same time, JPM has made, at the very least, a tacit admission that it was "*anticipated* that [the Authority] would issue variable rate refunding bonds if JPM exercised the . . . Swaption." (Doc. # 18, at 13 (emphasis added); *see also* Doc. # 18, at 18 n.20 (providing that "[t]he parties clearly foresaw that the [the Authority] may have been unable, or unwilling, to issue refunding bonds").)

undert[ook] a refunding issuance . . . is beyond the scope of the Swaption Agreement." (Doc. # 13, at 13.)  Pointing to § 2(a)(iii) of the Master Agreement, JPM also asserts that the Authority's contractual obligations are subject only to the "conditions precedent" expressly enumerated and that none of those conditions precedent includes "refunding as a condition." (Doc. # 13, at 11.)

And under governing New York law,[26] JPM says that extrinsic evidence of such an alleged condition precedent may not be considered because it is outside the four corners of the Swaption Agreement.  Reliance also is placed upon the agreement's merger clause as barring consideration of any matter extrinsic to the Swaption Agreement.  (Doc. # 13, at 12.) In short, JPM's arguments focus solely on the contract language.

On the other hand, the Authority takes a more expansive view.  It contends that, having described the parties' expectations and assumptions, it adequately has alleged that its "ability to issue variable rate refunding bonds was a condition precedent to [JPM's] exercise of the [S]waption."[27]  (Doc. # 16, at 25.)  Section 2(a)(iii) incorporates into its terms "each other applicable condition precedent specified in this Agreement," and the Authority argues that the Swaption Agreement "is replete with evidence that variable rate refunding bonds

---

[26] The Swaption Agreement provides that it is "governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine, except that issues relating to the statutory power and authority for and authorization of this Agreement by [the Authority] shall be governed by and construed in accordance with the laws of the State of Alabama."  (U.S. Municipal Counterparty Schedule, Part 4(e).)

[27] In its brief, the Authority explains that its theory "is less one of mutual mistake,[] as [JPM] suggests, than of failure of a condition precedent to the exercise of the [S]waption."  (Doc. # 16, at 25 n.23.)  Liberally construing the Complaint, the court will assume the same.

34

were to be issued by the Authority if [JPM] exercised the [S]waption."  (Doc. # 16, at 26.)

It says, for example, that it is not "mere happenstance" that the November 1, 2008 "exercise

date" specified in the Swaption coincides with the first date upon which the Series 1998

Bonds could be redeemed and refinanced with refunding bonds, or that the Swaption's

termination date also is the final maturity date for the Series 1998 Bonds.  (Doc. # 16, at 27.)

Alternatively, the Authority argues that, if the court finds "as a matter of law that the

condition precedent of the Authority's ability to issue refunding bonds was not obvious on

the face of the [S]waption documents . . . , extrinsic evidence is admissible to prove the

existence of the condition."  (Doc. # 16, at 28 n.30.)

### b.    Conditions Precedent under New York Law

In *Lindenbaum v. Royco Property Corp.*, 567 N.Y.S.2d 218 (App. Div. 1991), cited

by the Authority, the court defined a contractual "'condition precedent' . . . as 'an act or

event, other than a lapse of time, which must exist or occur before a duty of immediate

performance of a promise arises.'"  *Id.* at 220 (citation omitted).  "The general rule is that it

must clearly appear from the contract itself that the parties intended a provision to operate

as a condition precedent . . . and that where there is ambiguity in a contractual term, the law

does not favor a construction which creates a condition precedent."  *Willis v. Ronan*, 631

N.Y.S.2d 50, 51 (App. Div. 1995) (internal quotation marks and citation omitted).

And in *Hicks v. Bush*, 180 N.E.2d 425 (N.Y. 1962), also relied upon by the Authority,

the court explained the circumstances when a condition precedent that is not written in the

contract can be considered.  *Hicks* held that "[p]arol testimony is admissible to prove a condition precedent to the legal effectiveness of a written agreement, if the condition does not contradict the express terms of such written agreement."  *Id.* at 427 (internal citations omitted).  The purpose of the rule espoused in *Hicks* "is not to vary the agreement but to establish that it never became legally effective." *Studley v. Nat'l Fuel Gas Supply Corp.*, 485 N.Y.S.2d 880, 883 (App. Div. 1985).  In *Hicks*, the court considered parol evidence that an unwritten condition of the written merger agreement was that it would not be effective until $672,500 in equity expansion funds were procured.  *See* 180 N.E.2d at 426.  The court held that there was "no direct or explicit contradiction between the oral condition and the writing" because the oral condition "deal[t] with a matter on which the written agreement . . . [was] silent."  *Id.* at 427.

### c.    Analysis

It is not necessary at this juncture to decide whether JPM or the Authority has the better argument as to whether the express terms of the Swaption Agreement condition JPM's exercise of the Swaption upon the Authority's ability to issue variable rate refunding bonds.[28] Even if it ultimately is determined that the condition precedent does not "clearly appear from the contract itself," *Willis*, 631 N.Y.S.2d at 51, the court finds that the Complaint's allegations provide sufficient amplification, at the very least, to render it plausible that there

---

[28] But, having considered the case law and arguments, it appears that JPM may have the upper hand as to that argument.

was an extra-contractual agreement that JPM's exercise of the Swaption was contingent upon the Authority's ability to issue variable rate refunding bonds.

While JPM says that any supposed extra-contractual condition precedent "is at odds with the language of the integrated Swaption Agreement, and thus parol evidence of its purported existence may not be offered" (Doc. # 18, at 15), JPM's theory of "at odds" is not clearly explicated.  That is understandable, however, as it has been recognized that "the line between consistent and inconsistent conditions precedent may be a fine one." *Intercontinental Monetary Corp. v. Performance Guars., Inc.*, 705 F. Supp. 144, 149-50 (S.D.N.Y. 1989).  *Hicks* sets out the standard under New York law for evaluating inconsistency:

> A certain disparity is inevitable, of course, whenever a written promise is, by oral agreement of the parties, made conditional upon an event not expressed in the writing.  Quite obviously, though, the parol evidence rule does not bar proof of every orally established condition precedent, but only of those which in *a real sense* contradict the terms of the written agreement. . . .

180 N.E.2d at 427 (emphasis added).

JPM has relied upon the merger clause as excluding consideration of extrinsic evidence as to the existence of an extra-contractual condition precedent.  JPM's reliance is not unfounded.  *See Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (N.Y. 2001) ("The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing[.]").  There is authority, however, as JPM also has recognized (Doc. # 18, at 14), that

under New York law the inclusion of a merger clause, like the one in the Swaption

Agreement, is not an automatic bar to consideration of parol evidence as to the existence of

a condition precedent:

> It is well settled that parol evidence may be admissible to establish a condition precedent to the legal effectiveness of a written contract if such condition is not contradictory to, or in variance with, the written terms of the agreement, . . . *and the merger clause, which provides that the written document embodies the entire agreement of the parties, is of no consequence until there is a contract in effect.*

*Mack-Lowe v. Picault-Cadet*, 823 N.Y.S.2d 55, 55-56 (App. Div. 2006) (emphasis added);

*see also Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc.*, 439 N.Y.S.2d 566, 568 (App.

Div. 1981) ("The parol evidence is offered to prove a condition precedent before the contract

could become effective. The merger clause, which provides that the written document

embodies the agreement of the parties, has no significance until there is a contract.");

*Procopis v. G. P. P. Rests., Inc.*, 352 N.Y.S.2d 230, 232 (App. Div. 1974) ("The statement

in the contract, in effect, that the written document embodies the agreement of the parties and

may not be changed or terminated orally has no significance until there is a contract.").

Based upon the foregoing authority, the court is not persuaded that the merger clause

presently proves the necessary contradiction.

Nor does the fact that the Swaption Agreement enumerates other conditions precedent

create the requisite inconsistency. "[I]t is . . . clear that evidence of an oral condition is not

to be excluded as contradictory or 'inconsistent' merely because the written agreement

contains other conditions precedent." *Hicks*, 180 N.E.2d at 428.

Like the written agreement in *Hicks*, the Swaption Agreement contains no provision addressing what would occur if the Authority were unable to obtain refunding bonds if JPM exercised the Swaption.  Indeed, there is syllogy between the alleged extra-contractual condition precedent and the Swaption Agreement's terms because, as even JPM acknowledges, certain provisions of the Swaption Agreement "were designed to facilitate [the Authority's] contemplated bond issuance." (Doc. # 18, at 13.) Moreover, JPM's alleged representations to the Authority made before the Swaption Agreement was executed and amended lend some support to the existence of an unwritten contractual condition precedent (Compl. ¶ 7) or, at the very least, as argued by the Authority, demonstrate that resolution of the issue on the Rule 12(b)(6) facts would be premature absent consideration of the evidentiary record.[29]

---

[29] For instance, the Authority has submitted documents comprising presentation/marketing materials provided by JPM to the Authority in connection with the Swaption at issue. (*See* Ex. C to Doc. # 17 (Tabs 1-4).)  Among other things, those materials contain statements, such as that, should JPM exercise the Swaption, the Authority "can either unwind the swap by making or receiving a termination payment . . . *or move forward with the synthetic refunding of the [Series 1998] Bonds*." (Doc. # 17-4, at 13 (emphasis added).)  At another point in the presentation discussing "[e]xecution strategies," and using the Series 1998 Bonds as an example, it is provided that, if "[JPM] exercises the option[,] [t]he Authority issues floating rate refunding bonds and enters into the swap agreement." (Doc. # 17-4, at 27.)  The Authority says that these documents are the "subject of the Complaint's allegations" (Doc. # 16, at 9 n.7), but it has not urged consideration of these documents at the motion to dismiss stage.  Rather, the Authority says that these presentation materials "simply illustrate that the Complaint's factual allegations will be supported by the evidentiary record[.]" (Doc. # 16, at 9 n.7.)  These documents also are not relied upon for purposes of ruling on the motion to dismiss.  Their existence merely is noted.  It also is recognized that JPM says that these presentation materials contain statements that, in fact, support its position, for one, that in entering into the Swaption Agreement, the Authority bore the risk that a liquidity facility needed for refunding bonds would not be available if JPM exercised the Swaption. (Doc. # 18, at 18 n.20.)

As discussed *supra*, the allegation that the 2001 Act "was intended to apply specifically to the [S]waption" (Compl. ¶ 10) and the 2001 Act's specific requirements imposed upon the Authority in order to refund its Series 1998 Bonds also raise substantial, but unanswered, questions as to whether obtaining refunding bonds was a condition precedent to the Authority's performance under the Swaption, once exercised by JPM.

Finally, JPM's position is inconsistent for a more fundamental reason. The Authority had authority to enter into a swaption for the purpose of interest rate hedging. Its Series 1998 Bonds had a fixed interest rate for twenty years (Compl. ¶ 2) – there was no interest rate risk to hedge against in 2008. The authorization for a swaption could only therefore be based upon a refunding of the Series 1998 Bonds. JPM cannot seriously contend that the parties intended anything other than the statutorily-authorized Swaption anchored by a refunding of the bonds. In sum, the court finds that there are sufficient facts making it "plausible" that the Swaption was predicated upon the issuance of refunding bonds. *Ashcroft*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp.*, 550 U.S. at 570).

    *2.    Whether the Authority Has Pleaded Facts that Demonstrate an Inability to Issue Refunding Bonds Under the 2001 Act and/or the 2004 Act*

    **a.    The Complaint's Allegations**

The Authority says that it did not have the ability in November 2008, when JPM "exercised the Swaption," "to issue variable rate refunding bonds in compliance with Alabama law[.]" (Compl. ¶ 11.) In the Complaint, the Authority cites the 2001 Act and

2004 Act as the Alabama laws at issue (Compl. ¶ 11), and focuses on its alleged inability to comply with the Acts' requirement pertaining to the balancing of the "aggregate annual payment obligation" against the "aggregate annual amount payable on the Refunded Bonds." (Compl. ¶ 11.)  More specifically, the Authority alleges that the "aggregate annual payment obligation," referred to in both the 2001 Act and the 2004 Act, "include liquidity and support costs associated with [the Authority's] ability to issue and, if necessary, to remarket its bonds[.]" (Compl. ¶ 11.)  It says that "[t]hose costs, coupled with . . . the fixed rate payments due to [JPM] under the [S]waption, w[ould] substantially exceed, as of November 1, 2008, the aggregate amount payable on the Series 1998 Bonds that would be refunded by virtue of [JPM's] exercise of the [S]waption." (Compl. ¶ 11.)  The Authority further alleges that JPM was aware when it notified the Authority in June 2008 of its intent to exercise the Swaption, that the aggregate annual payment obligation would exceed the aggregate annual amount payable on the Series 1988 Bonds if refunded.  (Compl. ¶ 11.)  The Authority alleges that the Swaption, therefore, is voidable.[30]  (Compl. ¶ 13.)

### b.   *Expressio Unius est Exclusio Alterius*

JPM says that the Authority's claim – that a refunding would not comply with the 2001 Act and the 2004 Act – is flawed because under both Acts the "aggregate annual

---

[30] The Authority has pleaded that the Swaption is *voidable* at its option because it allegedly cannot satisfy the aggregate annual payment obligation test under either the 2001 Act or the 2004 Act, given its position that "liquidity and support costs" are included in the definition of "aggregate annual payment obligation."  (Compl. ¶¶ 11, 13.)  The relief sought on this claim is not altered by the fact that the Authority has briefed this claim under the section of its brief titled, "The Swaption is Void."  (Doc. # 16, at 15 & 21.)

payment obligation" under the swap and refunding bonds do not include "liquidity and support costs."[31]  (Doc. # 13, at 16-17.)  JPM argues that the parenthetical directly following the phrase "aggregate annual payment obligation" means that the "'aggregate annual payment obligation' is determined 'taking into account payments under such swap agreements combined with payments on the refunding obligations.'"[32]  (Doc. # 13, at 17.)  Relying on the rule of statutory construction "*expressio unius est exclusio alterius*," JPM says that the parenthetical inclusion of two specified "payments" – *i.e.*, (1) "payments under such swap agreements" and (2) "payments on the refunding obligations" – excludes liquidity and

---

[31] JPM also says that the change in the 2004 Act – requiring merely that "the Authority . . . *shall have determined* its aggregate annual payment obligation . . . in an amount *not expected to exceed* the aggregate annual amount payable on the Refunded Bonds" – "render irrelevant the [Authority's] allegation that current levels of 'liquidity and support costs' would cause the aggregate annual payment obligation under the swap and any refunding to 'substantially exceed, as of November 1, 2008' the amount payable on the original bonds." (Doc. # 13, at 17-18 (emphasis omitted).)  Earlier in this opinion, the applicability of the 2004 Act to the 2002 Swaption Agreement was called into question. That discussion applies equally here and demonstrates why JPM's argument is insufficient to sustain a ruling in its favor at this phase of the proceedings.

[32] The parenthetical is the same under both the 2001 Act and the 2004 Act; thus, for present purposes, it is not necessary to differentiate between the two Acts or to resolve the tension between the two Acts as applied to the Swaption Agreement.

support costs from the definition of "aggregate annual payment obligation."[33]  (Doc. # 13, at 17 & n.8.)

*Expressio unius est exclusio alterius* is a canon of statutory interpretation.  It "stands for the proposition that the mention of one thing implies the exclusion of the other." *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*, 177 F.3d 1204, 1209 (11th Cir. 1999); *see also Ex parte Univ. of S. Ala.*, 761 So. 2d 240, 245 n.9 (Ala. 1999) (The doctrine, *expressio unius est exclusio alterius*, means "that the express inclusion of requirements in the law implies an intention to exclude other requirements not so included." (internal quotation marks and citation omitted)).  This doctrine, however, is subject to certain exceptions:

> [T]he maxim will be disregarded and an expanded meaning given where an expanded interpretation will accomplish beneficial results, where [application of the maxim] would thwart the legislative intent made apparent by the entire act, [or where the expanded meaning would] serve the purpose for which the statute was enacted, is a necessary incidental to a power or right, or [reflects] the established custom, usage or practice.

*Ex parte Univ. of S. Ala.*, 761 So. 2d at 245 n.9 (alterations in the original); *see also Wilhelm Pudenz, GmbH*, 177 F.3d at 1209 (The doctrine of *expressio unius est exclusio alterius* "has

---

[33] The Authority argues that JPM's position that the calculation of the "aggregate annual payment obligation" excludes liquidity and support costs "is at odds with the plain meaning of the 2001 and 2004 Acts and ignores the economic reality of the swaption." (Doc. # 16, at 23.)  The Authority contends that JPM's argument would mean that "'debt service' (*i.e.*, repayment of principal and interest) is equivalent to 'aggregate annual payment obligation.'"  (Doc. # 16, at 23 n.21.)  It says that "[s]tatutory construction requires a presumption that use of the term 'debt service' in the statute, but omission of the term from the description of 'aggregate annual payment obligation,' was purposeful."  (Doc. # 16, at 23 n.21.)  "Had the Legislature intended to use 'debt service' – words with which it obviously was familiar – in place of 'aggregate annual payment obligation,' it would have done so."  (Doc. # 16, at 23 n.21.)  As the Authority puts it, JPM "appears to argue that 'aggregate' means 'some' rather than 'sum.'"  (Doc. # 16, at 23 n.1.)

43

its limits and exceptions and cannot apply when the legislative history and context are contrary to such a reading of the statute.").

The court is not inclined to rest an interpretation of "aggregate annual payment obligation," as used in the 2001 Act and 2004 Act, on the legal maxim *expressio unius est exclusio alterius* for several reasons.  First, courts have attributed limited utility to the doctrine in the arena of statutory interpretation.  *See United States v. Castro*, 837 F.2d 441, 443 n.2 (11th Cir. 1988) ("A discussion of the *expressio unius* idea is always necessarily accompanied by a discussion of its limitations.  [It has been] suggest[ed] that this is perhaps a rule honored more in the breach than in the observance[.]"); *Dir., Office of Workers' Comp. Programs v. Bethlehem Mines Corp.*, 669 F.2d 187, 197 (4th Cir. 1982) ("The maxim [*expressio unius est exclusio alterius*] is to be applied with great caution and is recognized as unreliable.").

Second, JPM recognizes that liquidity and support costs are "connect[ed] with issuing refunding bonds" (Doc. # 13, at 17 n.7), but seems to say that liquidity and support costs are not "payments *on the refunding obligations*" (Doc. # 13, at 17 (emphasis in original).) However, the doctrine *expressio unius est exclusio alterius* does not aid JPM's interpretation because there is no statutory list of what components comprise "refunding obligations."  In other words, the negative inference to be doctrinally derived from the inclusion of a statutory list is absent.  *Cf. United States v. Martinez*, 182 F.3d 1107, 1113 (9th Cir. 1999) (As to what constitutes a "felony drug offense" under 21 U.S.C. § 841(b)(1)(A), "[t]here is no list of prior

44

felony drug offenses from which [the defendant's] *expressio unius est exclusio alterius* inference could be drawn.").

Third, the phrase "taking into account," as used in the 2001 Act and 2004 Act, does not include any limiting commands, such as "solely" or "only," or otherwise purport to be exclusive.  While JPM says that the aggregate annual payment obligation "*is determined*" by "taking into account" the statutorily-delineated payments (Doc. # 13, at 17 (emphasis added)), JPM's restrictive phrase – "is determined" – is notably absent from the Acts' language.  Rather, the phrase "taking into account" appears inclusive in the sense that the Acts outline two categories of payments ("payments under such swap agreements" and "payments on the refunding obligations") that are to be taken into account, but leave open the possibility of other payments being included.

Fourth, the doctrine should be applied only as a means of discovering the legislative intent, where that intent is not otherwise apparent or manifest.  Here, as pointed out by the Authority, the "Legislative intent," at least as to the 2004 Act, is express:  "It is the Legislative intent that savings realized by this bill . . . may be utilized to reduce debt service appropriations[.]"  Act of May 17, 2004, No. 2004-533, § 4, 2004 Ala. Acts 533.  That section, at least for purposes of rejecting JPM's reliance on the legal maxim *expressio unius est exclusio alterius*, suggests an expansive, rather than a restrictive, definition of "aggregate

annual payment obligation," in order to maximize savings.[34]  *See Ex parte Univ. of S. Ala.*,

761 So. 2d at 245 n.9 (The maxim *expressio unius est exclusio alterius* is not applicable

"where [application of the maxim] would thwart the legislative intent made apparent by the

entire act, [or where the expanded meaning would] serve the purpose for which the statute

was enacted[.]").   Accordingly, the court finds that JPM's arguments predicated upon

*expressio unius est exclusio alterius* are insufficient to justify granting JPM's motion to

dismiss.  The issues pertaining to what payments comprise the aggregate annual payment

obligation, which Act applies, and whether the Authority's aggregate annual payment

obligation complies with the applicable Act survive the motion to dismiss.[35]

---

[34] JPM also says that the statutory scheme that governs bonds issued by the Authority delineates
different revenue sources for the Authority's payment of "expenses of [bond] issuance," *see* Ala. Code
§§ 16-16-9(g), 16-16-10(q), and the payment of principal and interest on mature bonds, *see* Ala. Code
§§ 16-16-11, 16-16-12.  But, given the other findings above, the court is not prepared to conclude today
that liquidity and support costs incurred in connection with issuing refunding bonds cannot be considered
part of the Authority's "aggregate annual payment obligation," within the meaning of the 2001 Act or the
2004 Act, based solely upon the delineation of separate accounts.  (Doc. # 13, at 17 n.7 (citing Ala. Code
§§ 16-16-9(g), 16-16-10(q), 16-16-11, 16-16-12); Doc. # 18, at 21.)

[35] The Authority asserts that, assuming that the court were to find that it (the Authority) validly
entered into the Swaption and that the "aggregate annual payment obligation" is met, then there are other
reasons making it "impossible" for the Authority to issue variable rate refunding bonds.  (Doc. # 16, at
29.)  Those additional reasons focus on an alleged "practical inability" to issue refunding bonds based
upon "currently prevailing market conditions" that "frustrate[d] the purpose of the [S]waption."  (Doc.
# 16, at 29.)  Those conditions are that, since November 1, 2008, there has been no liquidity facility
available to the Authority at a cost that would effectuate the purpose of the Swaption, and that the
absence of a liquidity facility is the result of the unforeseeable national credit crisis which was beyond
the parties' control.  (Doc. # 16, at 29.)  It is not necessary to address these additional arguments in
order to resolve the issues presented in JPM's motion to dismiss, given that the Rule 12(b)(6) record
gives the court sufficient pause to decline JPM's invitation to dismiss the claims upon which the
Authority's assumptions above are made.  These issues may be reasserted at a later stage of this
litigation, if appropriate.

## VI.  CONCLUSION

Whether the Swaption is void, voidable, or a bad but binding deal bought into by the Authority is a question not capable of resolution without development of the facts. Accordingly, it is ORDERED that JPM's Motion to Dismiss (Doc. # 6) is DENIED.

DONE this 21st day of July, 2009.

/s/   W.  Keith Watkins
UNITED STATES DISTRICT JUDGE