IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA PUBLIC SCHOOL AND COLLEGE AUTHORITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACT. NO.  2:08CV863-WKW (WO) |
| JPMORGAN CHASE BANK, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. Introduction**

In this case, the Alabama Public School and College Authority (APSCA) seeks declaratory relief requesting the court to declare void or voidable a 2002 swaption agreement between it and defendant JPMorgan Chase Bank (JPM).  The nature of the swaption and the substantive issues involved in this case are described earlier in the court's opinion on JPM's motion to dismiss.  *Alabama Public School and College Authority v. JPMorgan Chase Bank*, --- F.Supp. 2d ---, 2009 WL 2171896 (July 21, 2009).   On May 5, 2010, the APSCA filed a motion to compel. (doc. # 33)  On June 9, 2010, the court heard argument on the motion.  At that time, the parties told the court that they had resolved all issues raised in the motion to compel except for document request No. 8 in which the APSCA seeks

> All documents (including communications) that reflect or relate to
> JPMorgan's accounting for the Agreement (or any transaction decribed in
> or contemplated by the Agreement) including, without limitation,

documents that reflect any revenue or income recognized or cost or expense incurred by JPMorgan at the inception of the Agreement or thereafter.

Stripped of the verbosity of typical discovery requests, by this request the APSCA wants to know how much[1] JPM recognized[2] on its books in 2002, when the swaption agreement was executed. JPM objects, contending that its "revenues are not at issue in this action and bear no relationship to the question of whether the transactions were proper under Alabama law."

FED.R.CIV.P. 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . " The Committee Comments to FED.R.CIV.P. 26 confirm that requiring relevance to a claim or defense "signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." GAP Report of Advisory Committee to 2000 amendments to Rule 26. In determining what discovery to allow, the court is likewise guided by some other fundamental principles. "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible

---

[1] At oral argument, APSCA clarified its request. "[W]hat we're interested in is the revnue or income recognized for the cost or expense incurred." (Trans. Oral Arg. at 23)

[2] As explained by counsel, the term "recognized" as used here means "there is an estimate made at the beginning of the transaction by J.P. Morgan how much it thought it would make on these transactions based on whatever assumptions are made about future events." (Oral Arg. Tr. at 18) Put another way, recognizing a gain contingency by "booking" it at the time of an executed transaction is typical in accrual accounting practices.

evidence." FED.R.CIV.P. 26(b)(1).

> [D]istrict courts have broad discretion in fashioning discovery rulings, they are bound to adhere "to the liberal spirit of the [Federal] Rules." *Burns v. ThiokolChem. Corp.*, 483 F.2d 300, 305 (5th Cir. 1973). The Federal Rules do not give district courts "blanket authorization . . . to prohibit disclosure of information whenever it deems it advisable to do so, but is rather a grant of power to impose conditions on discovery in order to prevent injury, harassment, or abuse of the court's processes." *Williams v. City of Dothan,Ala.*, 745 F.2d 1406, 1416 (11 Cir. th 1984) (quoting *Bridge C.A.T. Scan Assocs.v. Technicare Corp.*, 710 F.2d 940, 944-45 (2nd Cir. 1983)).

*Adkins v. Christie*, 488 F.3d 1324, 1331 (11th Cir. 2007).

With these general principles in mind, the court will now address the arguments relating to this discovery dispute.

## II. The Motive Argument

In its motion to compel, the APSCA argued that the requested information "likely will reflect what the Authority contends is a clear financial motive for JPMorgan to alter the Agreement in a manner that failed to comply with Alabama law." The complaint filed by APSCA contends that the swaption transaction is void or voidable because it violated Alabama law. JPM argues that its motive in entering into the swaption agreement is wholly irrelevant to whether the swaption agreement is consistent with Alabama law. On these narrow terms the court agrees. Discernment of JPM's motive is not relevant to a claim or defense in this case. FED.R.CIV.P. 26(b)(1).

## III. What is the True Nature of the Swaption Agreement?

APSCA argues that the revenue which JPM booked at the time the agreement was executed is "part of the fundamental structure of the Swaption Agreement . . . [and] also provides insight into JPMorgan's entry into a transaction that depart materially from a true swaption." (Mot. Compel at 7)  In a related argument, the APSCA contends that the swaption transaction was more akin to a loan that an interest rate swaption. *(Id.* at 8) In its last brief on the question, APSCA's argument is more focused.

> [T]he amount of revenue recorded by JPMorgan is probative on the issue of whether the swaptions, as characterized by JPMorgan, were permissible hedges under Alabama law (or, for that matter, whether they were hedges at all).  This is so because the total economic value of the swaptions is the sum of (1) the payments the Authority received, (2) the payments made to third-party professionals who were compensated for their work on the transactions, and (3) the amount of money that JPMorgan recorded as its own revenues on the transactions. As discussed below, it is that total value that must be compared to the value of what JPMorgan claims the Authority sold in order to determine whether the transactions had a lawful hedging purpose under Alabama law.

(APSCA Supp. Mem. Doc. # 52 at 2)

One of APSCA's principal arguments in this case relates to the refunding and refinancing of Series 1998 Bonds issued by APSCA which contends that the

> swaptions were components of an integrated series of transactions. Central to those transactions was the parties' agreement that if JPMorgan exercised its option to place the Authority into swaps, those swaps would be settled by the Authority's redemption, or "call," of its existing fixed rate Series 1998, 1999A, 1999C, and 1999D bonds and its issuance of variable rate refunding bonds on which the swaps would be placed.  The objective of the transactions was to allow the Authority to complete synthetic advance refundings of its fixed rate bonds – that is, to realize in 2002 (and, by virtue of amendments to the swaptions in 2003) the anticipated debt service savings associated with bond refundings that could not otherwise be

undertaken until 2008 or later.

(APSCA Mem. doc. # 52 at 2-3)

APSCA further argues that the only hedge associated with the transactions was a "hedge against interest rates payable on the to-be-issued variable rate refunding bonds . . . ." *Id.* at 3.

> When the total value of the swaptions is compared to the total value of the Authority's call rights, the Court will be able to draw no conclusion other than that JPMorgan's view of the hedge in the swaption transactions means that the Authority received far more money than its call rights were worth because it agreed to take on substantial risk that it did not otherwise have. Stated differently, the only conclusion to be drawn from JPMorgan's characterization of the swaptions is that they not only failed to reduce or eliminate a potential loss – the very purpose of a hedge - but actually created an enormous risk of loss for the Authority.

(*Id.* at 5)

In response, JPM argues that there is no authority for APSCA's contention that the value of the swaption must equate to the value of its call right in order for the swaption to constitute a hedge. (JPM Supplemental Resp. dn # 58 at 1-2) "APSCA's argument that the swaptions were not hedges because *'the payment it [i.e., APSCA] received'* allegedly exceed the value inherent in the Authority's call rights does not in any way depend on how much JPMorgan earned on the transaction . . . " (*Id.* at 2)

The parties present other arguments, but the court's reiteration of these arguments is sufficient to support the court's fundamental conclusion about this discovery dispute. The parties' contentions revolve around a single, all encompassing question. What did

5

the parties intend when they entered into the swaption transaction. The heading of this section of this opinion puts the question another way: What is the true nature of the swaption agreement? In its earlier Memorandum Opinion the court asked a series of questions, each of which in some way or another touch on this same, central question. *See Alabama Public School and College Authority v. JPMorgan Chase Bank*, --- F.Supp. 2d ---, --, 2009 WL 2171896, *25-26 (July 21, 2009).

Jurisdiction in this case is founded on diversity; therefore, "state law applies to any issue not governed by the Constitution or treaties of the United States or Acts of Congress." *Mid-Continent Cas. Co. v. American Pride Bldg. Co., LLC,* 601 F.3d 1143, 1148 (11th Cir. 2010). In Alabama, the central question in interpreting a contract is the intent of the parties.

> "Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. *See Loerch v. National Bank of Commerce of Birmingham*, 624 So.2d 552, 553 (Ala.1993). Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. *See Ex parte Dan Tucker Auto Sales, Inc.*, 718 So.2d 33, 36 (Ala.1998). If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written. *See id.* at 36; *Voyager Life Ins. Co. v. Whitson*, 703 So.2d 944, 948 (Ala.1997)."

*Homes of Legend, Inc. v. McCollough*, 776 So.2d 741, 746 (Ala.2000).

Given the arguments of the parties in this dispute, as well as the complexity of the swaption agreements, it is patently obvious that the intent of the parties will not be

susceptible to easy interpretation.  Alabama law is clear; the actions of a party with respect to an agreement or references within an agreement have probative value with respect to the intent of the parties to the agreement.  *See, e.g. Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir. 1993); *Beverly v. Macy*, 702 F.2d 931, 941 (11th Cir. 1983); *Blocker v. Lowry*, 233 So.2d 233, 235 (Ala. 1970).

Thus, after careful consideration of the arguments of the parties, the court concludes that JPM's booking of revenue at the time the swaption agreement was executed has probative value with respect to how it viewed the nature of the agreement.  In other words, JPM's valuation of the agreement is relevant to its view of the nature of the contract.  Therefore, under FED.R.CIV.P. 26(b)(1) the discovery sought by APSCA is relevant to a claim or defense in this case.

### IV.  Possible Prejudice to JPM

The court's conclusion about the relevance of APSCA's discovery does not end the court's enquiry, however.  Notwithstanding the protective order entered in this case on January 19, 2010, (doc. # 29) JPM argues that disclosure of the amount of revenue it booked could harm JPM because it would disclose proprietary information about how it conducts its business.  (Trans. Oral Arg. at 24)   The court finds the harm argument unpersuasive in the context of this case.  It is undisputed that JPM no longer engages in this type of derivative business.  JPM has presented no evidence or argument that the protective order is insufficient to protect any interest that it has regarding its valuation of

the transactions.

## V. Conclusion

For the foregoing reasons, the court concludes that the motion to compel should be granted.  As earlier noted, APSCA clarified that its seeks only the amount which JPM booked at the time the swaption agreement(s) were executed.  Thus, the court's order applies only to that number or those numbers.  Accordingly, it is

ORDERED that the motion to compel as characterized in this opinion and order be and is hereby GRANTED.  JPM shall produce the number or numbers on or before September 1, 2010.  It is further

ORDERED that APSCA's motion for fees and expenses be and is hereby DENIED.

Done this 18TH day of August, 2010.

        /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE